906 A.2d 440 (2006)
388 N.J. Super. 42
C.W., as Father of J.W., a Minor and in His Own Right, and E.Y., as Mother of J.W., a Minor and in Her Own Right., Plaintiffs-Appellants,
v.
The COOPER HEALTH SYSTEM, d/b/a Cooper Hospital/University Medical Center, Edison Catalano, M.D. and Anthony Sherman, M.D., Defendants-Respondents, and
David Gerber, M.D., G. Haddad, M.D., and Bruce B. Cunningham, M.D., Defendants.
Superior Court of New Jersey, Appellate Division.
Argued June 6, 2006.
Decided August 10, 2006.
*442 Gayle R. Lewis, Bryn Mawr, PA, argued the cause for appellants (Ms. Lewis and Matthew D. Schelkopf, on the brief).
*443 Stacy L. Moore, Jr. argued the cause for respondent The Cooper Health System d/b/a Cooper Hospital/University Medical Center (Parker McCay, attorneys; Carolyn Sleeper, Marlton, of counsel; Mr. Moore, on the brief).
Joel B. Korin argued the cause for respondent Edison Catalano, M.D. (Ballard Spahr Andrews & Ingersoll, attorneys; Mr. Korin and Paul F. Jenkins, Voorhees, on the brief).
Sharon K. Galpern, Voorhees, argued the cause for respondent Anthony Sherman, M.D. (Stahl & DeLaurentis, attorneys; Ms. Galpern, on the brief).
Britcher, Leone & Roth, attorneys for amicus curiae ATLA-NJ (E. Drew Britcher, Glen Rock, and Jessica E. Choper, on the brief).
Before Judges WEFING, FUENTES and GRAVES.
The opinion of the court was delivered by
FUENTES, J.A.D.
The principal issue raised in this appeal requires us to determine whether a physician and/or hospital can be held civilly liable in damages to an individual who contracted the human immunodeficiency virus ("HIV") from a former patient who was not informed of the results of an HIV test ordered by the physicians responsible for the patient's care. We now hold that a health care provider, who orders an HIV test for a patient, has a duty to take reasonable measures to notify that patient of the results of the test.
This duty is made even more paramount when the test results indicate that the patient is positive for HIV, because: (1) such a patient may be in immediate need of medical treatment; and (2) from a public health perspective, such patient must also be advised on how to prevent the transmission of the virus to others. A health care provider who violates this duty becomes civilly liable to not only the patient, but to all reasonably foreseeable individuals who contract the virus from the HIV positive patient. Because the Law Division held otherwise, we reverse that aspect of its ruling.
The trial court also dismissed the claims against defendant Dr. Edison Catalano, the director of Cooper Hospital's pathology department, after concluding that plaintiffs' expert report amounted to nothing more than a net opinion. We are in agreement with the trial court in this respect, and affirm that aspect of its ruling.
The legal questions under review here came before the Law Division by way of summary judgment motions filed by a number of the named defendants in the action. We will thus set out the pertinent facts from the limited record developed before the motion judge. Before undertaking to describe these facts, however, we will, in the interest of clarity, first outline the procedural history that led to the filing of this appeal.

I
Plaintiffs C.W. and E.Y. filed a verified complaint on behalf of themselves and their minor daughter J.W. against Cooper Health System d/b/a Cooper Hospital/University Medical Center ("Cooper Hospital"), and Anthony Sherman, David Gerber, and Ghada Haddad, physicians employed by Cooper Hospital who were responsible for C.W.'s medical treatment. Plaintiffs also named as defendants Dr. Edison Catalano, the head of Cooper Hospital's pathology department, and C.W.'s personal physician, Bruce Cunningham.[1]
*444 The complaint alleged that defendants had breached a duty of care owed to each of the plaintiffs, by failing to inform C.W. of the results of an HIV test ordered at the time he was a patient at Cooper Hospital. As a result, C.W. was not informed of the need to seek timely medical treatment, and to take precautionary measures to avoid transmitting the virus to E.Y. and their child.
Approximately one year after the joinder of issue, the trial court granted defendants' motion for summary judgment seeking the dismissal of E.Y.'s claims as a matter of law. In granting the motion, the court ruled that defendants did not have a legal duty to inform E.Y. of C.W.'s HIV status. Shortly thereafter, the court granted defendants the same relief with respect to the claims raised on behalf of plaintiffs' minor child. We denied plaintiffs' motion for interlocutory review of these orders.
Defendant Catalano also moved for summary judgment on the ground that plaintiffs' expert report purporting to describe Catalano's duties as head of Cooper Hospital's pathology department was inadmissible as a net opinion. The trial court agreed, finding that plaintiffs had failed to present evidence showing that Catalano had breached a legally recognized duty of care. Thereafter, the motion judge denied plaintiffs' motion for reconsideration.
Approximately six months after this round of motions, Dr. David Gerber, one of C.W.'s treating physicians, entered into a settlement agreement with plaintiffs disposing of all claims against him. The consent order memorializing the settlement agreement indicated that, "Dr. David Gerber only is HEREBY dismissed [from] any and all claims [E.Y.] and [J.W.] may have against him." Despite this ostensibly clear language, the order also contained the following provisions:
[1.] Neither Dr. Gerber nor Dr. Sherman will be placed on the jury verdict sheet and their names will also be removed from the caption;
[2.] Remaining Defendant[s] will not argue [that] Dr. Gerber or Dr. Sherman deviated from accepted standards of care. . . .
We note that the language specifically limiting the relief afforded by the settlement agreement with respect to the claims asserted by E.Y. and the child to Dr. Gerber "only", cannot, on its face, be reconciled with these two provisions. We are satisfied, however, that the parties to the settlement agreement intended that the claims asserted by E.Y. and the child against Dr. Sherman remained viable.[2] Less than a month after the Gerber settlement, Cooper Hospital entered into a settlement agreement with C.W. that also included a waiver of the right to appeal the dismissal of C.W.'s claims against Dr. Catalano.
Thus, as this procedural history illustrates, the only claims remaining are those asserted by E.Y. and the child against defendants Cooper Hospital, through its employees Dr. Sherman and Dr. Haddad, and Dr. Catalano individually, in his capacity as head of Cooper Hospital's pathology department.

*445 II

A

C.W.'s Hospitalization
On August 5, 1994, twenty-nine-year-old C.W. was admitted into Cooper Hospital complaining of confusion, changes in mental status, and progressive lethargy. He was placed in the intensive care unit, where Dr. Gerber was an attending physician. C.W.'s history of drug use involved only marijuana, and the result of a hospital-administered drug-screening test was negative. Dr. Gerber, as well as the interns and residents then employed by Cooper Hospital, initially suspected that any of the following could be among the possible causes for C.W.'s condition: encephalopathy with or without drug use, encephalitis, meningitis, or a psychiatric episode. These physicians also consulted with an infectious disease specialist and a neurologist.
On August 7, 1994, just two days after C.W.'s admission into Cooper Hospital, a resident identified as Dr. Altamura wrote an order for an HIV test. Dr. Gerber countersigned the order, thus indicating his approval. Given his medical condition, C.W.'s mother signed the required consent form for the HIV test. The form read, in pertinent part, as follows:
My doctors have told me that I require HIV antibody testing.
I have read and I understand the information provided in the patient information sheet entitled, "About the HIV Antibody Test." I have had an opportunity to discuss with [blank space where "Dr. Altamura" was written in script] information about the HIV antibody test, its benefits, its risks and any alternative tests. I have had a chance to ask questions and they have been answered to my satisfaction.
* * * *
I understand that whether my test results are positive or negative, I will be offered counseling about HIV and the meaning of the results. I also understand that my medical care will not be prejudiced by my decision about whether or not to have an HIV antibody test or by the results of the test. I am aware that confidential and anonymous HIV testing is available outside of Cooper Hospital/University Medical Center. I may choose not to be tested at this time.
My signature below means I have been given all of the information I desire regarding this blood test and its possible results. The report of this test will become a part of my permanent hospital record and would be available to those who are entitled to see my record. I hereby give my permission to have the HIV antibody test performed on a sample of my blood.
[Emphasis added.]
The next day C.W. was awake and sufficiently oriented to answer questions. Because he was slurring his words, the treating physicians decided to bring in a neurologist for a consultation. C.W.'s condition had improved sufficiently, and so he was transferred from the intensive care unit to a medical floor where Dr. Haddad was one of the interns. As the physician responsible for the supervision of the interns and residents, Dr. Sherman became C.W.'s attending physician. This ended Dr. Gerber's role of overseeing C.W.'s medical care. The transfer notes summarizing C.W.'s care up to that point indicated that the HIV test results were pending.
On August 10, 1994, three days after C.W.'s mother authorized the administration of the HIV test, C.W. was discharged *446 from Cooper Hospital. He was diagnosed with having suffered toxic encephalopathy from marijuana use. Cooper Hospital's discharge instructions indicated that he was given the "regular" instructions, as well as informed that he was not to engage in strenuous exercise. C.W. was directed to report to his personal physician if he experienced loss of consciousness, severe neck pain, vomiting, or nausea. The discharge summary notes, which were dictated for Dr. Sherman's signature, did not mention that an HIV test had been ordered or that the results of an HIV test were pending.

B

The HIV Test
During the period in question, Cooper Hospital did not use an on-site laboratory as part of its pathology department to perform HIV tests for admitted patients. The pathology department's central receiving laboratory ("CRL") sent test samples to outside laboratories and thereafter was responsible for receiving the test result reports.
Dr. Catalano was the supervisor of the pathology department during all times relevant to this case. The only evidence of the procedures established by Cooper Hospital to process a physician's request for HIV testing came through Dr. Catalano's deposition testimony. Thus, according to Dr. Catalano, all test reports from outside laboratories would be marked to his attention, even though they would be processed by the CRL's non-physician supervisor or her staff. Upon the receipt of a test report, a staff member would advise the patient's treating physician to contact the CRL for the results.
In order to maintain the confidentiality of HIV test results, CRL staff did not send doctors ordering the test copies of HIV reports, nor log the results into any of Cooper Hospital's computer systems. The established procedure required CRL staff to record the HIV test results in a notebook maintained exclusively for this purpose.
Dr. Catalano did not recall whether the CRL used any "quality assurance" system to ensure that attending physicians were informed when test results arrived from outside laboratories. Other than the procedures previously described, Dr. Catalano also did not recall any written policy for handling the reports of HIV test results.
Dr. Catalano asserted that attending physicians bore the responsibility of relating HIV test results to their patients, and explained that the CRL would not relate HIV test results to the patient unless the attending physician had so requested in writing. Although Dr. Catalano was aware of the obligation to report positive HIV test results to the New Jersey Department of Health at the time C.W.'s HIV test was performed, he assumed that this responsibility fell upon the outside laboratories that actually performed the tests.
C.W.'s HIV test was performed by SmithKline Beecham Clinical Laboratories ("SmithKline"). In a report dated August 13, 1994, and marked to Dr. Catalano's attention, it indicated that C.W. had tested positive for HIV. According to Dr. Catalano, at the time C.W. was discharged from Cooper Hospital, the only responsibility the CRL staff had upon receipt of a positive HIV report was to notify the patient's treating physician or the physician who ordered the test. Remarkably, however, there were no written procedures in place to make any effort to contact the patient directly, or to notify the State Department of Health.
The record here is undisputed that neither Dr. Sherman nor Dr. Gerber was notified of C.W.'s positive HIV test results. *447 According to Dr. Sherman, if he had been given the results of an HIV test that was still pending upon a patient's discharge, he would have contacted the patient or the patient's personal physician. Patients who did not name a personal physician were typically referred to Cooper Hospital's medical clinic.
Victoria Brent, a social worker and psychotherapist at Cooper Hospital's medical clinic, indicated that if the clinic received a positive HIV test result for a discharged patient, who was not already scheduled for a follow-up appointment, she would contact the individual responsible for HIV patient notification at the Camden County Board of Health. Brent did not keep records of her calls and did not recall whether she had called the Board of Health about C.W.'s test results.

C

E.Y.'s Involvement
In the fall of 1994, E.Y. and C.W. became sexually involved with one another. On July 18, 1995, their daughter J.W. was born. According to E.Y., although she could not state so with certainty, she may have had an HIV test during her pregnancy, because such testing had become routine at the time. C.W. and E.Y. lived together until December of 1999.
In July of 2000, Dr. Bruce Cunningham, C.W.'s personal physician at the time, treated him for fatigue, fever, rash, and abdominal complaints. In April of 2002 he referred C.W. to a gastroenterologist who performed an endoscopy and diagnosed him as suffering from severe candida esophagitis,[3] a known and frequent complication of the acquired immune deficiency syndrome ("AIDS"). Based on this diagnosis, Dr. Cunningham ordered an HIV test from a clinical laboratory. The results indicated that C.W. had developed AIDS.
Shortly thereafter, E.Y. was also tested. Her test results revealed that she was positive for HIV. In her deposition, E.Y. testified that she had not been sexually involved with any other person following her separation from C.W. in 1999. The child J.W. tested negative for HIV.

D

Standard of Care Evidence
Plaintiffs presented reports and deposition testimony of three physicians in opposition to defendants' motions for summary judgment. Dr. Frank Guinn reviewed C.W.'s medical history, including his five-day stay at Cooper Hospital and issued a report dated March 25, 2003. According to Dr. Guinn, there was "an absence of instructions and appropriate follow-up on the discharge of this patient." Although he opined that such a failure "to communicate the positive HIV results to the patient" was "a significant deviation from the standard of care," he did not state the appropriate standard or indicate its source. He believed that the deviation constituted "very clear" negligence on the part of "Cooper Hospital, its attending physicians in the ICU and the medical floor, its consults and employees." He concluded, without any specificity, that "[f]urther negligence by the defendants caused [E.Y.] to be infected by [C.W.]."
Dr. Kenneth Lewis issued a report dated May 5, 2003. He reviewed C.W.'s Cooper Hospital records, as well as the records from two other medical institutions, *448 and the "reporting requirements for providers and hospitals in New Jersey for HIV disease and AIDS," all of which were provided by plaintiffs' counsel. Without expressly stating the relevant standard of care, Dr. Lewis concluded that Cooper Hospital and its employees had deviated from the standard of care in the following manner: (1) Cooper Hospital employees Dr. Jose Diaz Jimenez (the physician, who approved C.W.'s discharge instructions), and the attending nurse(s) "did not advise [C.W.] to obtain follow up [sic] of his pending HIV results" and did not schedule a follow-up appointment for him; (2) Dr. Catalano and the CRL staff failed to ensure that the pending test results would be provided to C.W.'s attending or treating doctors after his discharge; and (3) Dr. Sherman, Dr. Gerber, and Dr. Haddad and other unspecified resident physicians failed "to solicit and act on the results of [C.W.'s] positive HIV test results when they came [sic] available on 8/13/94."
The final expert evidence presented by plaintiffs came from pathologist Dr. John Shane, the former medical director of both a hospital laboratory and a commercial laboratory in Pennsylvania. Dr. Shane reviewed Cooper Hospital's records of C.W.'s hospitalization, as well as the subsequent medical records of the plaintiffs, and issued a report dated October 25, 2003. According to Dr. Shane, the "standard practice of Laboratory Medicine" requires a medical lab to "insure that all significant laboratory results reach the eyes of the attending physicians and that patients with significant disease processes diagnosed definitively by laboratory modalities are promptly identified and brought to treatment." He thus opined that "[a]nything short of that practice is substandard." The use of an outside laboratory for the actual testing in his opinion, did not diminish Cooper Hospital's responsibility to be informed of the test results, and thereafter notify the patient.
In Dr. Shane's opinion, Cooper Hospital, Dr. Catalano and the CRL staff, all shared responsibility "to have in place reporting modalities that will deliver laboratory testing results to the attending physicians after the patient is discharged." Without describing what procedures Cooper Hospital and its employees used or should have used, Dr. Shane opined that the failure to convey the test results "to the attending clinicians" demonstrated that Cooper Hospital's actions "did not meet expected standards."
Dr. Shane asserted that "[t]he regulations of the Department of Health; the laws of the state of NJ; the regulations of the Joint Commission on Accreditation Hospitals [sic]; and the regulations of the College of American Pathologists" all required C.W.'s attending physicians to report the positive HIV test results and required Dr. Catalano to "provide for" such reporting. This assertion, however, is not supported by even a summary of the alleged laws or regulations that it referenced.[4]
In his deposition Dr. Shane identified the regulations of the College of American Pathologists as the source for his opinion that the medical director of a clinical laboratory was responsible for instituting methods to inform attending physicians of test results that are received after a patient is discharged. He added, however, that even if such protocols had been in place, the event under review here would nonetheless be a deviation from the standard *449 of care. Stated differently, according to Dr. Shane "[s]omebody ought to [be] responsible."
More generally, Dr. Shane based his assessment of Dr. Catalano's duty on the fact that "[e]very textbook of medicine ... will say that when an HIV test is positive you must treat." Thus, on the principle that "[t]he physician is the captain of the ship in terms of the treatment of that patient," he or she remains responsible, as "the ultimate caregiver," for the proper performance of any delegated task. When confronted with a representation that the so-called "captain of the ship" doctrine was not the governing standard in New Jersey, Dr. Shane responded that "[c]ommon sense" compelled his conclusion, because otherwise "the physician has no responsibility to the patient."

III

Standard of Review
We review a grant of summary judgment de novo, using the same standard that applied in the trial court. Turner v. Wong, 363 N.J.Super. 186, 198-99, 832 A.2d 340 (App.Div.2003). That standard is "`whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536, 666 A.2d 146 (1995) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202, 214 (1986)). Summary judgment must be denied if "the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Id. at 523, 666 A.2d 146.

IV

Duty of Care
In Olivo v. Owens-Illinois, Inc., 186 N.J. 394, 398-99, 895 A.2d 1143 (2006), our Supreme Court recently reviewed the question of duty of care in the context of third party liability. The issue in Olivo concerned "whether a landowner can be liable for injuries allegedly caused from asbestos exposure experienced by the wife of a worker who had performed welding and steam fitting tasks that brought him into contact with asbestos on the landowner's premises." Ibid.
Writing for the Court, Justice LaVecchia noted that courts "traditionally have been reposed with responsibility for determining the scope of tort liability." Id. at 401, 895 A.2d 1143. In going about this task, we start by inquiring whether the imposition of a duty to exercise care to avoid harm to another comports, under the circumstances, with basic notions of fairness and is in furtherance of sound public policy. Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439, 625 A.2d 1110 (1993).
Foreseeability is the key to determining whether imposing a duty of care is fair and reasonable.
Foreseeability is significant in the assessment of a duty of care to another; moreover, it has a dual role in the analysis of tort responsibility. Generally, our jurisprudence recognizes "foreseeability as a determinant of a [defendant's] duty of care . . . [as well] as a determinant of whether a breach of duty is a proximate cause of an ultimate injury."
[Olivo, supra, 186 N.J. at 402, 895 A.2d 1143 (quoting Clohesy v. Food Circus Supermarkets, Inc., 149 N.J. 496, 502-03, 694 A.2d 1017 (1997)).]
*450 Applying these legal principles to the facts in Olivo, the Court held that Exxon Mobil had a duty to protect its workers from the known consequences of exposure to asbestos in the work place. The court further held, that:
[T]o the extent Exxon Mobil owed a duty to workers on its premises for the foreseeable risk of exposure to friable asbestos and asbestos dust, similarly, Exxon Mobil owed a duty to spouses handling the workers' unprotected work clothing based on the foreseeable risk of exposure from asbestos borne home on contaminated clothing. We agree with the Appellate Division's assessment of the fairness and justness of imposing on Exxon Mobil such a duty to plaintiff's wife.
[Id. at 404-05, 895 A.2d 1143 (emphasis added).]
Although the question in Olivo concerned premises liability, the analytical paradigm used by the Court to determine the duty of care owed to a third party is equally useful here. As the employer in Olivo owed a duty of care to its employees to protect them against the known risks of exposure to asbestos, Cooper Hospital had a duty to notify C.W. of the results of his HIV test. This diagnostic test was ordered by Cooper Hospital's staff physicians as part of the medical treatment received by C.W. while he was a patient at the hospital.
The medical significance of the test is self-evident. Even back in 1994, HIV was well known to be an extremely serious medical condition. Although a patient who tested positive for HIV at that time had limited treatment options, his chances of arresting or at least delaying the development of full blown AIDS depended upon the immediate commencement of an aggressive treatment campaign. From a public health perspective, a person who tested positive for HIV also needed to be told how to prevent transmitting the virus to others. By incorporating these concerns into its HIV test consent form, Cooper Hospital articulated the appropriate standard of care.
Cooper Hospital's duty to notify C.W. of the results of his HIV test did not end upon his discharge. As noted by plaintiffs' expert, Dr. Lewis, the medical professionals responsible for preparing C.W.'s discharge summary and instructions should have clearly and conspicuously indicated that the test results were pending. C.W. should have been advised to contact a hospital representative for a follow-up appointment to discuss the results of the test. Alternatively, given the seriousness of what was at stake, Cooper Hospital should have made some effort to contact C.W. directly.[5]
The next step in the analysis requires us to determine whether Cooper Hospital's duty of care extended to E.Y. as well. As C.W.'s sexual partner, we conclude that Cooper Hospital owed E.Y. the same duty of care the employer in Olivo owed to its employee's wife. As in Olivo, the question here turns on foreseeability.
It is entirely foreseeable that C.W., a twenty-nine-year-old individual, was, or would likely be sexually active. Indeed, a central part of Cooper Hospital's responsibility involved advising C.W. on the steps he needed to take to avoid transmitting *451 the virus to another person. Under these circumstances, E.Y., as C.W.'s sexual partner, falls within the scope of foreseeable individuals who would be harmed by Cooper Hospital's failure to inform C.W. of his HIV positive status.
The Appellate Division of California reached the same conclusion in Reisner v. Regents of Univ. of Cal., 31 Cal.App.4th 1195, 1200-04, 37 Cal.Rptr.2d 518 (1995). The plaintiff in Reisner was the boyfriend of a teenage girl who had been infected with HIV when she received a transfusion of tainted blood. The physician who supervised the transfusion failed to notify the teenager and her family. Id. at 1197-98, 37 Cal.Rptr.2d 518. The boyfriend became infected after having had sexual relations with the girl. The appellate court reversed the trial court's dismissal of the boyfriend's negligence suit against the girl's doctor, holding that:
[W]hen "a physician treats a patient who has been exposed to or who has contracted a communicable and/or contagious disease, it is imperative that the physician give his or her patient the proper advice about preventing the spread of the disease. Communicable diseases are so named because they are readily spread from person to person. Physicians are the first line of defense against the spread of communicable diseases, because physicians know what measures must be taken to prevent the infection of others. The patient must be advised to take certain sanitary measures, or to remain quarantined for a period of time, or to practice sexual abstinence or what is commonly referred to as `safe sex.'

[ ] Such precautions are taken not to protect the health of the patient, whose well-being has already been compromised, rather such precautions are taken to safeguard the health of others. Thus, the duty of a physician in such circumstances extends to those `within the foreseeable orbit of risk of harm' .... If a third person is in that class of persons whose health is likely to be threatened by the patient, and if erroneous advice is given to that patient to the ultimate detriment of the third person, the third person has a cause of action against the physician, because the physician should recognize that the services rendered to the patient are necessary for the protection of the third person."

[Id. at 1202, 37 Cal.Rptr.2d 518 (quoting DiMarco v. Lynch Homes-Chester County, Inc., 525 Pa. 558, 583 A.2d 422, 424-25 (1990)).]
Here, defendants successfully argued before the trial court that even if they had known the identity of C.W.'s sexual partner, they were legally precluded from advising her of his HIV status by the AIDS Assistance Act, N.J.S.A. 26:5C-1 to -24. This argument misses the point.
The question is not whether defendants have a duty to notify E.Y. directly of C.W.'s HIV test results. The duty of care to a third party such as E.Y. requires the health care provider to take all reasonable measures to notify the patient of the results of his HIV test, and thereafter counsel the infected patient on how to avoid the transmission of the virus. Once this is done, it is up to that individual to act responsibly in his own conduct. Thus, the harm to E.Y. flows from C.W.'s ignorance of his own health status, not from Cooper Hospital's failure to notify E.Y. of C.W.'s medical condition.
The imposition of this duty of care upon health care providers also promotes sound public policy. As the Legislature declared more than twenty-two years ago: "[t]he effective identification, diagnosis, care and treatment of persons who have contracted [HIV and] ... `AIDS,' is of paramount *452 public importance." N.J.S.A. 26:5C-2a. HIV and AIDS is not just a personal tragedy, but a burgeoning public health crisis, because "[p]eople who have already been infected might not be aware of their exposure and may unknowingly infect hundreds more individuals." N.J.S.A. 26:5C-2f.
We thus hold that the duty of care of Cooper Hospital and its staff physicians extended to plaintiff E.Y., because she is within the class of reasonably foreseeable individuals whose health is likely to be threatened by the patient's ignorance of his own health status. Stated differently, a third person has a cause of action against a health care provider if the services rendered to the patient are necessary for the protection of the third person.

V

Insufficiency of Expert's Opinion
Appellants argue that as supervisor of the CRL, Dr. Catalano had a duty to ensure that the physician responsible for C.W.'s treatment received the results of his HIV test. It is undisputed that Dr. Catalano cannot show that C.W.'s test results were in fact delivered or otherwise made known to any of C.W.'s doctors. Plaintiffs further argue that "regulations" required Dr. Catalano to report C.W.'s positive test results to the State Department of Health and Senior Services, which presumably would have informed C.W. Thus, according to plaintiffs, the motion judge erred when he determined that plaintiffs' expert report amounted to a net opinion, not supported by competent authority. We disagree.
The reporting requirements for HIV and AIDS are set forth in N.J.A.C. 8:57-2.2. Subsection (a) of this regulation promulgated by the Department of Health and Senior Services provides that:
Every physician attending a person found to be infected with HIV, or ordering a test resulting in the diagnosis of HIV, shall, within 24 hours of receipt of a laboratory report indicating such a condition, or within 24 hours of making a diagnosis of HIV infection or AIDS, report in writing such condition directly to the Department of Health and Senior Services on forms supplied by the Department of Health and Senior Services.[6]
[Emphasis added.]
In addition, "[e]very clinical laboratory" must report to the Department of Health and Senior Services after completing "a quantitative PCR (viral load) test, regardless of test result," or any other HIV test that returns a positive result. N.J.A.C. 8:57-2.2(c). If a physician "is aware that" a hospital "is reporting [such a] person as being infected with HIV" or that the person "has previously been reported to the Department ... as being infected with HIV," then the physician is relieved from the responsibility of making an additional report. N.J.A.C. 8:57-2.2(a). The same is true for a hospital. N.J.A.C. 8:57-2.2(b). Clinical laboratories are not exempted from this reporting requirement, regardless of whether some other health professional has already done so.
It must be emphasized, however, that a physician or hospital can rely on a clinical laboratory's report only if the report had been made on some "previous" occasion. Here, the clinical laboratory's (SmithKline) reporting obligation was contemporaneous with the reporting obligation of Cooper Hospital and the treating *453 doctors. As such, Cooper Hospital and the treating doctors remained legally obligated to report C.W.'s positive HIV test results to the Department of Health. N.J.A.C. 8:57-2.2(a), (b).
This regulatory scheme is not relevant to determining Dr. Catalano's duty of care as a director of Cooper Hospital's pathology department. Dr. Catalano was not one of C.W.'s "attending" physicians. He was not involved in the decision to order an HIV test for the purpose of diagnosing C.W.'s medical condition and he was not the supervisor of SmithKline, the laboratory that actually performed C.W.'s HIV test to "completion." The trial court therefore correctly ruled that the regulation did not require Dr. Catalano to report C.W.'s test results to the Department of Health.
Relying on Dr. Shane's report and his deposition testimony, plaintiffs also argue that Dr. Catalano had a common law duty to report C.W.'s HIV test results. The evidence presented by plaintiffs does not support this argument. Expert opinions are admitted at the trial court's discretion. State v. Summers, 176 N.J. 306, 312, 823 A.2d 15 (2003); B.F. Goodrich Co. v. Oldmans Twp., 323 N.J.Super. 550, 551, 733 A.2d 1204 (App. Div.1999). Experts may opine on the basis of their "knowledge, skill, experience, training, or education," N.J.R.E. 702, but they may not give a "net opinion," which is an opinion that is unsupported by factual evidence and is thus inadmissible. In re Yaccarino, 117 N.J. 175, 196, 564 A.2d 1184 (1989); Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981).
An expert must give "the why and wherefore of his expert opinion, not just a mere conclusion." Jimenez v. GNOC Corp., 286 N.J.Super. 533, 540, 670 A.2d 24 (App.Div.), certif. denied, 145 N.J. 374, 678 A.2d 714 (1996). Experts in negligence cases must establish the actual existence of a standard of care, and may not simply declare their personal preferences or the conduct they wish to encourage as being the standard. Fernandez v. Baruch, 52 N.J. 127, 131, 244 A.2d 109 (1968); Taylor v. DeLosso, 319 N.J.Super. 174, 179-80, 725 A.2d 51 (App.Div.1999); Crespo v. McCartin, 244 N.J.Super. 413, 422-23, 582 A.2d 1011 (App.Div.1990).
Here, the trial court correctly found that Dr. Shane's report amounted to nothing more than a net opinion. As discussed above, the report erroneously stated that the statutes and regulations gave Dr. Catalano and the CRL a duty to report C.W.'s positive test results to the Department of Health. It further stated that the "regulations" of certain professional bodies imposed a similar duty, but failed to relate their actual language or demonstrate that they were mandatory.
Dr. Shane declared the practices of the two laboratories where he had worked to represent "[t]he standard practice of Laboratory Medicine," with no indication of how and why those laboratories developed their practices. See Taylor, supra, 319 N.J.Super. at 179-80, 725 A.2d 51 (unexplained statement that "accepted practice" required particular actions was merely expert's "personal" standard and thus "equivalent to a net opinion"); accord Kaplan v. Skoloff, 339 N.J.Super. 97, 103, 770 A.2d 1258 (App.Div.2001). He also failed to give a basis for making a hospital's pathology department or its supervisor separately liable from the hospital for the same negligent acts.
Dr. Shane's deposition testimony also failed to elucidate the basis for his conclusion that Dr. Catalano breached a recognized duty of care. His implication that Dr. Catalano had a duty to "treat" C.W.'s HIV infection, based only on his observation that "[e]very textbook of medicine ... *454 will say that when an HIV test is positive you must treat," is a quintessential net opinion. Such a broad unsupported statement provides no explanation as to how pathology department personnel become vested with a duty to provide actual medical treatment to a patient who is under the care of attending physicians. Indeed, this assertion is inconsistent with Dr. Shane's description of his own duties when he supervised a hospital laboratory. In this capacity, Dr. Shane testified that he did not "treat" patients beyond ensuring that their attending physicians received their test results.
Finally, Dr. Shane's invocation of the doctrine of "the captain of the ship," a concept that makes a physician vicariously liable for the negligence of others who were involved in caring for the same patient, but were not under the doctor's control or supervision, has been expressly rejected in New Jersey by Tobia v. Cooper Hosp. Univ. Med. Ctr., 136 N.J. 335, 346, 643 A.2d 1 (1994); Diakamopoulos v. Monmouth Med. Ctr., 312 N.J.Super. 20, 34-35, 711 A.2d 321 (App.Div.1998); Johnson v. Mountainside Hosp., 239 N.J.Super. 312, 322, 571 A.2d 318 (App.Div.), certif. denied, 122 N.J. 188, 584 A.2d 248 (1990); Sesselman v. Muhlenberg Hosp., 124 N.J.Super. 285, 290, 306 A.2d 474 (App.Div.1973). We now reaffirm our rejection of this doctrine as incompatible with our State's tort jurisprudence.

VI

Conclusion and Recapitulation
The trial court's judgment dismissing plaintiff E.Y.'s complaint against Cooper Hospital and the attending physicians of C.W. is reversed. The court's order dismissing plaintiff's complaint against Dr. Edison Catalano is affirmed. The matter is remanded for trial.
We turn now to the claim of J.W., the daughter of C.W. and E.Y., born approximately one year after her father's discharge from Cooper Hospital. The nature of her claim is not clearly delineated before us. Clearly, she can have no present claim herself for she fortunately was born without the HIV virus. To the extent that she is asserting a claim that she is at an increased risk for becoming HIV positive in light of her parents' condition, we reject that claim. Those cases which have permitted a recovery based upon an increased risk of harm are, in our judgment, distinguishable, because they involve the existence of an underlying condition. J.W. does not have such an underlying condition.
The order under review is affirmed in part and reversed in part and the matter is remanded for further proceedings. We do not retain jurisdiction.
NOTES
[1] Cunningham is not a party to this appeal, and the record does not indicate that he participated in the proceedings before the trial court.
[2] Dr. Sherman himself implicitly acknowledges this in the "Statement of Procedural History" included in his brief filed in this appeal.
[3] Candida esophagitis is a fungal or yeast infection of the esophagus. Stedman's Medical Dictionary, 237, 537 (25th ed.1990).
[4] N.J.S.A. 26:5C-6 requires that "all diagnosed cases of HIV infection shall be reported to the department [of health] along with the identifying information for the person diagnosed."
[5] We note, as a matter of common experience, that in the process of admitting and discharging patients, hospitals routinely acquire a great deal of personal information from patients, including place of residence, telephone number, name and location of employer, etc. Although most of this information is gathered to assist the hospital's billing department, it can certainly be made available to serve a medical need.
[6] The regulation contained the same language during the relevant time period. It was amended in 2003 to broaden reporting requirements by including insurers as entities that require HIV testing as part of an underwriting process. N.J.A.C. 8:57-2.2(b).