**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3294-17T3

RONALD CARABELLO,

    Plaintiff-Appellant,

v.

JACKSON DAWSON
COMMUNICATIONS, INC., and
TRANSCEND CREATIVE
GROUP, LLC,

    Defendants-Respondents.

_____

Argued February 27, 2019 - Decided March 26, 2019

Before Judges Koblitz and Mayer.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-10206-15.

Ernest P. Fronzuto argued the cause for appellant (Fronzuto Law Group, attorneys; Ernest P. Fronzuto and Casey Anne Cordes, on the brief).

Christina P. Fisher argued the cause for respondent (Law Office of William E. Staehle, attorneys; Christina P. Fisher, on the brief).

PER CURIAM

Plaintiff Ronald Carabello appeals from the October 10, 2017 order granting defendants, Jackson Dawson Communications, Inc. (Jackson) and its subsidiary Transcend Creative Group, LLC (Transcend), summary judgment based on the court's determination that when plaintiff was injured he was a "special employee" of defendants and therefore entitled only to benefits under the Workers' Compensation Act, N.J.S.A. 34:15-8. Plaintiff also appeals from the February 20, 2018 order denying reconsideration. Because plaintiff was not a special employee, we reverse.

Plaintiff began working for the New Jersey Sports and Exposition Authority (NJSEA) as a teamster truck driver in 1987. He operated a NJSEA-owned forklift at the Izod Center for event setup. He operated the same forklift for four years prior to his accident. He also made deliveries on behalf of NJSEA.

Plaintiff testified at deposition to the following. When setting up for events, he worked for NJSEA, although he "[s]ometimes" took direction from the non-NJSEA people running the events. His NJSEA supervisors directed him to help with event setup, by operating the forklift and assisting others: "Whatever [event set-up] need[s], I would have to do." Plaintiff said once his

NJSEA supervisors told him to assist the event set-up, he then was "under the authority of whoever else was telling [him] what to do."

NJSEA contracted with Transcend for the use and occupancy of the Izod Center for a Mercedes Benz event, which included a driving course, between July 14 and July 18, 2014. The terms of the contract were set forth in the facility occupancy license and included "set up and tear-down of the full event." The license provided:

> [Defendants] shall pay to [NJSEA] the cost of all direct and indirect labor, materials, supplies and service costs incurred by [NJSEA] as a result of the [e]vent, ordinary wear and tear excepted, and such other direct labor and special services as [NJSEA] may deem necessary or the licensee may request.

The agreement provided defendants would be responsible for certain fees, including a charge for a 5000 pound forklift with "extended forks." Defendants had to "abide by all applicable provisions of the [NJSEA]'s collective bargaining agreements covering the [NJSEA] employees who are union employees."

The Jackson Director of Automotive and Digital Solutions, who managed construction of the driving course, testified at deposition that because NJSEA was a "union city," it provided the forklift. Plaintiff was the only forklift operator at the Izod Center during the event. He was assigned by his NJSEA supervisors to operate the forklift to unload defendants' truck for two days. He

3

worked for two and one-half hours on day two before his injury occurred. Plaintiff testified that on the second day his NJSEA supervisors instructed him to take direction from an individual he believed worked for defendants. Plaintiff said: "I was told to report to Jackson[]'s head man on the premises whose name I did not know and whom I had never met before."

NJSEA did not allow defendants to secure their tent structure by drilling spikes or anchors into the pavement, as they had done at other venues. Instead, defendants used fifty-five gallon barrels filled with water to anchor the tent structure.

The "head man" instructed plaintiff to transport barrels filled with water using the forklift, despite plaintiff proposing that it might be better to transport the barrels while they were empty. While loading the filled barrels onto the forklift, two barrels fell off. Plaintiff was instructed to "[t]ake the extensions off" and "[p]ush the forks together," creating a ramp. The "head man" then helped plaintiff fill the barrels with water and load them on the reconfigured forklift. Plaintiff transported the filled barrels with the forklift one or two barrels at a time. The mechanics of the forklift required him to manually remove the barrels by "dragging the barrels off the forklift." Plaintiff's NJSEA supervisor informed him no one from NJSEA was available to help because

4

"[t]hey were doing other details." As plaintiff moved the last of sixteen barrels off the forklift, he "felt a pop in [his] shoulder."

Plaintiff drove to the NJSEA medical unit on the forklift and from there called his NJSEA supervisor to let him know that he hurt his shoulder while moving the barrels. Plaintiff filled out an incident report for NJSEA while he was in the medical unit. After speaking with NJSEA emergency medical technicians, he was transported to "the NJSEA contracted medical care provider for workers compensation." Plaintiff testified his only task for defendants' event that day was moving the barrels. After that was completed, he would have been doing other work for NJSEA had he not been injured.

In response to plaintiff's employee claim petition, NJSEA admitted that the injury occurred during the course of his employment with NJSEA. Plaintiff received workers' compensation benefits from NJSEA. He then sought further compensation from defendants. The trial court granted defendants summary judgment as a "special employer."

"We review a grant of summary judgment de novo, using the same standard that applied in the trial court." C.W. v. Cooper Health Systems, 388 N.J. Super. 42, 57 (App. Div. 2006). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it

is so one-sided that one party must prevail as a matter of law." Ibid. (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995)). A reviewing court will "review the facts in the light most favorable to" the non-moving party. DiProspero v. Penn, 183 N.J. 477, 482 (2005) (citing R. 4:46-2(c)).

The five-factor test for determination of a "special employer-employee relationship" is laid out in Kelly v. Geriatric and Medical Services, Inc., 287 N.J. Super. 567, 571-72 (App. Div. 1996), which provides:

> The applicable, though not exclusive, legal criteria to establish a special employer-special employee relationship involves the following fact sensitive five-pronged test:
>
> (1) the employee has made a contract of hire, express or implied, with the special employer;
>
> (2) the work being done by the employee is essentially that of the special employer;
>
> (3) the special employer has the right to control the details of the work;
>
> (4) the special employer pays the employee's wages; and
>
> (5) the special employer has the power to hire, discharge or recall the employee.
>
> [Ibid.]

In Walrond v. Cty. of Somerset, 382 N.J. Super. 227, 236 (App. Div. 2006) we discussed the weight to be given each factor:

Traditionally, the five factors are weighed to determine special employment. No single factor is "necessarily dispositive, and not all five must be satisfied in order for a special employment relationship to exist." Marino v. Ind. Crating Co., 358 F.3d 241, 244 (3d Cir. 2004) (citing [Blessing v. T. Shriver & Co., 94 N.J. Super. 426, 433-34 (App. Div. 1967)]). Generally, however, it is believed that the most significant factor is the third: whether the special employer had the right to control the special employee.

[Ibid.]

It is not enough to review the language of the factors without an investigation into the factual background provided in the case law. In Blessing, a special employee relationship was found not to exist after a jury awarded damages to the plaintiff. 94 N.J. Super. at 427-28, 439. The plaintiff was an employee of a detective agency who "was transferred from one locale to another as directed" by the detective agency. Id. at 428. The plaintiff had been working at defendant's foundry for three months before incurring an injury. Ibid. We concluded:

There can be no doubt that the guardwork done by plaintiff was undertaken in pursuance of [the detective agency's] contract with defendant. The benefit derived from the operation certainly accrued to defendant, but the actual work being done was the security job that [the detective agency] was hired to do. The control exercised by defendant over Blessing was only incidental in nature and of no particular legal significance. Also important is the fact that the proofs

7

> do not suggest any consensual relationship between plaintiff, a so-called "loaned" employee, and defendant for whose benefit his services as a guard were rendered. While such a consent may be expressed or implied, there is nothing in the record upon which to predicate a finding of knowledgeable consent or a fair inference that an employment relationship between those parties existed.
>
> [Id. at 436.]

Blessing was cited in the 2004 federal case of Marino, where the federal court also found the plaintiff was not a special employee, interpreting New Jersey law to allow an electrician, employed by an electric company and assigned to defendant's construction site for several weeks, to sue defendant for damages, in spite of the defendant's daily job instructions. 358 F.3d at 243, 246, 253. Similarly, in Murin, we found no special employment relationship where the plaintiff was an employee of a steel company for eighteen years, the defendant rented a concrete mixer truck from the steel company, and the plaintiff was assigned as the operator of the truck. Murin v. Frapaul Const. Co., 240 N.J. Super. 600, 603-04 (App. Div. 1990). The plaintiff worked on the job for nine days and sued the defendant after the defendant's employee turned on a hose that caused the plaintiff to fall from the top of the truck. Id. at 604

In Kelly, we found a special employment relationship where the plaintiff was a nurse employed by a staffing company who injured herself while working

at the defendant geriatric facility. 287 N.J. Super. at 570, 576 (noting the plaintiff's "work duties and job performances were assigned, directed and overseen by" the defendant, her "daily activities were controlled by" the defendant and "there was an absence of any such control by" the staffing company).

Here, plaintiff was hired as a union forklift operator, similar to the cement truck operator plaintiff in Murin. See 240 N.J. Super. at 604. Except here, plaintiff worked at the Izod Center rather than defendant's worksite, and had only worked under defendants' direction for a few hours. Thus, plaintiff had a lesser relationship with defendants than the plaintiff in Murin. See ibid. The five special employment factors must be reviewed with that factual backdrop in mind.

First, no express contract was agreed to between plaintiff and defendants. Plaintiff agreed to defendants' supervision at the NJSEA site, because he was directed to by NJSEA. Second, plaintiff was "essentially" doing the work of NJSEA when viewing the facts in the light most favorable to him. See Kelly, 287 N.J. Super. at 571; see also Brill, 142 N.J. at 540. Murin explains "that the employee remains in his general employment so long as, by the service rendered

another, he is performing the business entrusted to him by the general employer." 240 N.J. Super. at 608.

In Murin, we discussed the second element:

> There is no inference that because the general employer has permitted a division of control, it has been surrendered. The presumption of continued employment by the general employer is taken for granted as the beginning point of any lent-employer problem. To overcome this presumption a party must clearly demonstrate that a new temporary employer has been substituted for the old employer. This demonstration must include a showing that a contract was made between the special employer and the employee. Although consent to a new contract with a special employer may be implied from the employee's acceptance of the special employer's control and direction, such acceptance may actually be a continuance of obedience to the general employer's commands.
>
> [Id. at 608-09 (citations omitted).]

The court in Murin further noted, in circumstances similar to those occurring here, "[a] continuance of the general employment is also indicated in the operation of a machine where the general employer rents the machine and a servant to operate it, particularly if the instrumentality is of considerable value." Id. at 609. "This is based on arguments that the general employer would naturally reserve control necessary to ensure that his equipment is properly used,

10

and that a substantial part of any such operator's duties would consist in the continuing duty of maintenance of the equipment." Ibid.

The third factor, whether plaintiff's work was controlled by defendants, is not clear-cut. Defendants told plaintiff to move the barrels, but NJSEA told plaintiff to use the forklift to help defendants set up the event. Against the factual backdrop of prior case law, this factor does not clearly point to a special employee relationship with defendants. The court in Murin noted "the right to control the end result is distinguished from the method of arriving at it, and falls short of showing employment. Thus the borrower of a truck and driver can specify the cargo, destination and route without thereby being deemed to assume control of the work." Id. at 610 (citation omitted). Plaintiff testified the scope of his employment for NJSEA included helping production personnel with event setup, which involved operating the forklift and assisting others during the production process.

Regarding the fourth factor, payment of plaintiff by defendants, although defendants paid a fee for operation of the forklift, they did not pay plaintiff's salary. Murin, 240 N.J. Super. at 604, 611 (finding no special employment relationship existed where the defendant paid a fee to the general employer, concluding the defendant did not pay the plaintiff's salary). Finally, regarding

11

the fifth factor, the license does not provide defendants with the authority to hire or discharge plaintiff.

Because the facts supporting the five factors are similar to those cases where a special employee relationship was found <u>not</u> to exist, we reverse and remand for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3294-17T3