**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2466-18T1

LEAH COLEMAN,

    Plaintiff-Appellant,

v.

SONIA MARTINEZ,

    Defendant-Respondent.

_____

Argued October 22, 2019 – Decided November 15, 2019
Remanded[1] by Supreme Court March 13, 2020
Resubmitted March 13, 2020 - Decided April 13, 2020

Before Judges Hoffman, Currier and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-0599-16.

---

[1] On March 13, 2020, the Supreme Court remanded this matter after the parties agreed that the following statement in our November 15, 2019 opinion is not supported by the record: "The record indicates defendant was made aware of T.E.'s command auditory hallucinations that involved violence contemplated against plaintiff, . . . . (Slip op. at 14)." The Court directed that we "reconsider [our] decision with the corrected factual record." This opinion reflects our reconsideration based on the corrected record.

Ginsberg & O'Connor, PC, attorneys for appellant (Gary D. Ginsberg, on the briefs).

Bonner Kiernan Trebach & Crociata LLP and Ava M. Plakins (Bonner Kiernan Trebach & Crociata LLP) of the Pennsylvania bar, admitted pro hac vice, attorneys for respondent (Mark A. Lockett and Ava M. Plakins, on the brief).

PER CURIAM

Plaintiff Leah Coleman, a case manager at the New Jersey Department of Children and Families, Division of Child Protection and Permanency (the Division) appeals from a January 23, 2019 Law Division order granting summary judgment and dismissing her complaint against defendant Sonia Martinez, a licensed social worker and therapist, employed by the Hispanic Family Center of Southern New Jersey (HFC).

In March 2013, T.E.[2] experienced a severe psychotic episode; as a result, the Division effected the emergency removal of her five children from her home. On November 17, 2014, T.E., by then a mutual client of the parties, traveled to the Division's Camden office, where she violently attacked plaintiff by stabbing her with a knife twenty-three times.

---

[2] Due to the confidential medical information in the record, we refer to T.E. by her initials.

Three weeks before the attack, plaintiff wrote in a progress note that T.E. "has shared with a family member that she hears commanding voices, to which she feels an obligation to act on their commands." In addition, "T.E. shared with this family member that she has failed to report this to her therapists and psychiatrist . . . ." Plaintiff immediately reached out to defendant to share this important information. Upon learning of this development, defendant did not contact T.E.'s psychiatrist to report these significant new symptoms; instead, defendant contacted T.E. and questioned her about them. In questioning her, defendant identified plaintiff as the source of the report. She noted that defendant became upset during their conversation. T.E. subsequently learned that plaintiff intended to inform the Family Part of this development.

In granting defendant summary judgment, the Law Division judge declined to impose a duty on defendant to protect plaintiff or anyone else from harm, concluding T.E.'s attack was not foreseeable. On appeal, plaintiff argues that defendant deviated from the standard of care in failing to alert T.E.'s psychiatrist about the evidence of her psychosis, which would have led to the administration of antipsychotic medication, and prevented the stabbing. Because we conclude plaintiff presented sufficient evidence to support a finding

3

of particularized foreseeability, and therefore the imposition of a duty on defendant, we reverse the order of the trial court.

## I.

We discern the following facts from the summary judgment record and view them in the light most favorable to plaintiff. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523 (1995).

In March 2013, while standing in the street holding a child and screaming, T.E. shouted that "aliens are all over the world" and "they control everything." T.E. also reported having command auditory hallucinations urging her to harm herself. In addition to the removal of her children, a court involuntarily committed T.E. to Camden County Health Services Center (CCHSC), after an evaluation at Cooper University Medical Center. T.E. claimed the psychotic episode resulted from her first-time use of PCP.[3]

During her hospitalization in March 2013, T.E. advised her attending psychiatrist at CCHSC that she had no prior psychiatric history and her legal history was not discussed. T.E.'s discharge diagnosis from CCHSC stated: "PCP induced psychotic disorder with delusions, and hallucinations, onset during intoxication."

---

[3] Phencyclidine.

A-2466-18T1

T.E. was discharged from CCHSC in late March 2013, on the condition that she follow-up with substance abuse counseling at HFC. A progress note prepared by defendant indicates T.E. came into HFC for screening on April 13, 2013; however, it appears her intake was deferred because she was already scheduled to see a doctor at another agency. Defendant's October 1, 2013 progress note states T.E.'s "intake and screening was completed [t]oday." The note indicates T.E. admitted that she lied at the hospital about using PCP in order to secure an early release from the psychiatric unit.

In October 2013, T.E. began therapy with defendant at HFC. On November 3, 2013, an HFC psychiatrist, who defendant identified as "Dr. Brecker," completed an initial psychiatric evaluation of T.E. A treatment plan was implemented for T.E.; significantly, defendant agreed that Dr. Brecker provided that if T.E. exhibited any signs of decompensation, "she will be immediately referred for immediate appointment with me."

Over the course of the next several months, plaintiff asserts that T.E. began showing signs of decompensation and developing psychosis. For example, in early April 2014, T.E. was observed talking to herself during a group therapy session at HFC. At one point, she stood up and yelled, "I just saw Jesus." Defendant was made aware of T.E.'s outburst.

A-2466-18T1

On March 22, 2014, T.E. was seen by another HFC psychiatrist, Dr. Basant Singh, who diagnosed T.E. with depressive disorder and prescribed Prozac for her. In July 2014, defendant personally observed T.E. in the HFC waiting room responding to outside stimuli. When defendant confronted T.E. about her actions, T.E. stated she was probably using her cell phone; however, T.E. did not have her cell phone in her hand and was not wearing earphones. According to defendant's progress note of July 2, 2014, T.E. "vehemently denied 'hearing voices'" and was "upset," feeling "others are 'lying' about her" regarding hearing voices.

Dr. Singh evaluated T.E. again on July 5, 2014. The doctor did not note any evidence of psychosis or instability. The record indicates that defendant informed plaintiff that T.E was compliant with respect to attending her individual therapy sessions and taking her medication. Defendant stated that at the time, she thought T.E. had no symptoms of psychosis and she was not a danger to anyone.

On August 15, 2014, defendant observed T.E. being distracted, describing her as appearing to be "hearing or trying to listen to something." Notwithstanding defendant witnessing a second episode suggesting the presence

of hallucinations, on October 1, 2014, defendant wrote to plaintiff that T.E. was ready to have unsupervised parenting time with her children.

On October 28, 2014, plaintiff sent the email to defendant alerting her about T.E. hearing "commanding voices," and feeling "an obligation to act on their commands," but "fail[ing] to report this development to her therapists and psychiatrist." In the email, plaintiff advised defendant that the information is "viable to [T.E.'s] . . . current treatment plan."

On November 3, 2014, T.E. went to the Division's office to obtain a bus pass, encountered plaintiff in the hallway, and asked her if she was "sending her telepathic waves." In a November 7, 2014 progress note, defendant documented informing T.E. that plaintiff told defendant about T.E.'s family members reporting her hallucinations. T.E. became very upset upon learning of this, denied having any command hallucinations, and stated she was eager to have "[her] babies" back. Defendant took no action to have T.E. immediately evaluated by a psychiatrist; instead, she advised T.E. to "follow up with medications" and keep her "re-scheduled missed appointment with Dr. Singh," on November 18, 2014.

Later that day, T.E. called plaintiff and questioned why she would fabricate a story and tell defendant she was hallucinating. Plaintiff advised T.E.

that the Division took the position that she was incapable of parenting her children independently.

Four days before the stabbing, T.E. met with plaintiff and her supervisor, Donna Johnson, at the Division's office. T.E. appeared agitated and wanted Johnson to understand that the comment T.E. made to plaintiff regarding "telepathic waves," did not reflect that T.E. was crazy, but rather, that she and plaintiff were on the same "wavelength."

At her deposition, T.E. testified she was at her home on the date of the attack, when she again experienced auditory and visual hallucinations, including hearing plaintiff's voice and seeing her face in the sky. The commanding voices directed T.E. to travel to the Division office. T.E. complied and went to the Division office with the intent to "stab [plaintiff] or her supervisor." T.E. "ran into [plaintiff] in the hallway" and the attack occurred.

At her deposition, defendant conceded that "looking back," T.E. exhibited signs of psychosis, but at the time, defendant "did not believe that [T.E.] was a danger to herself or anybody else." According to plaintiff's expert witness, Charles A. Dackis, M.D., a psychiatrist, defendant deviated from the standard of care by failing to immediately alert T.E.'s psychiatrist about the evidence of

8

psychosis in T.E., and had defendant done so, T.E. would have been placed on antipsychotic medications and the stabbings would not have occurred.

Dr. Dackis further opined it was foreseeable T.E. would commit an act of violence upon plaintiff based upon T.E.'s history of assaults, her desire to regain custody of her children, and defendant's identification of plaintiff as the individual who reported T.E. hearing command voices. Dr. Dackis noted that defendant was in possession of a report by Dr. John O'Reardon referencing T.E.'s 2007 and 2011 aggravated assault charges; in the 2007 assault,

> the Camden Police were dispatched to [T.E.'s] address after she punched her landlord in the face, bit him, and stabbed him three times. She then chased him with another knife before the police arrived . . . . [T.E.] was later convicted of these charges and incarcerated.
>
> . . . . The Camden Police returned to [T.E.s] house on 12/26/11 after she assaulted her ex-roommate. [T.E.] threw hot olive oil on the woman, stabbed her several times and admittedly, 'cracked her in the face with a frying pan.' She was convicted of aggravated assault and again incarcerated.

The trial court granted summary judgment to defendant finding she owed no duty to plaintiff because there was a "lack of any direct threat communicated to the plaintiff - - or to the defendant regarding the plaintiff." Further, the trial court concluded that the facts "fail to rise to the level of that particularized

9

foreseeability" required for imposition of liability described by our Supreme Court in J.S. v. R.T.H., 155 N.J. 330, 342 (1998).

On appeal, plaintiff argues the trial court erred in granting summary judgment on the issue of particularized foreseeability because plaintiff produced substantial, credible evidence to support that claim. Defendant seeks affirmance.

## II.

Because the question of duty was decided in favor of defendant on summary judgment, we must "accept[] as true all the evidence and favorable legitimate inferences that support" plaintiff's claim. J.S., 155 N.J. at 336. The standard governing our review is well stated in Frederick v. Smith, 416 N.J. Super. 594, 599 (App. Div. 2010).

> Whether a duty should be imposed is a matter of law, Kernan v. One Washington Park Urban Renewal Associates, 154 N.J. 437, 445 (1998); Arvanitis v. Hios, 307 N.J. Super. 577, 581 (App. Div. 1998), that poses "'a question of fairness'" involving "'a weighing of the relationship of the parties, the nature of the risk, and the public interest in the proposed solution.'" [internal citations and quotations omitted]. In reviewing a trial judge's determination that a duty does or does not arise in a particular situation, we are bound neither by the trial judge's interpretation of the law nor the judge's view of the legal consequences of the alleged facts. Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

The duty analysis is "rather complex." J.S., 155 N.J. at 337. "[I]n its determination whether to impose a duty, [a court] must also consider the scope or boundaries of that duty." Id. at 339. Moreover, the court must recognize "the more fundamental question whether the plaintiff's interests are entitled to legal protection against defendant's conduct." Id. at 338 (citation omitted). That assessment must include the relationship between the parties, defendant's "responsibility for conditions creating the risk of harm[,]" and whether the "defendant had sufficient control, opportunity, and ability to have avoided the risk of harm." Id. at 339 (citation omitted).

With respect to the nature of the risk, both the "foreseeability and severity" of the "underlying risk of harm" and "the opportunity and ability to exercise care to prevent the harm" are considered. Id. at 337. To that end, "[t]he ability to foresee injury to a potential plaintiff is crucial in determining whether a duty should be imposed." Id. at 338 (internal quotations and citation omitted). The defendant must have actual knowledge or awareness of the risk of injury or constructive knowledge or awareness, which may be imputed when the defendant is "in a position to discover the risk of harm." Ibid. (internal quotations and citation omitted).

To sustain a cause of action for negligence, a plaintiff must establish four elements: "(1) [a] duty of care, (2) [a] breach of [that] duty, (3) proximate cause, and (4) actual damages[.]" Polzo v. Cty. of Essex, 196 N.J. 569, 584 (2008) (alterations in original) (quoting Weinberg v. Dinger, 106 N.J. 469, 484 (1987)). A "plaintiff bears the burden of establishing those elements 'by some competent proof . . . .'" Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 406 (2014) (citation omitted) (quoting Overby v. Union Laundry Co., 28 N.J. Super. 100, 104 (App. Div. 1953)).

The assault on plaintiff involved a violent physical attack. Indeed, plaintiff sustained "a hemothorax, pneumothorax, hemorrhagic shock, acute blood loss anemia," major depressive disorder, and post-traumatic stress disorder from the assault. Our Court has recognized the clear public policy to prevent a harm when it is foreseeable. For instance, in recognizing a duty on the part of a spouse "to take reasonable steps to prevent or warn of the harm" posed by his or her spouse's risk of sexually abusing children, id. at 350, the Court limited the duty to cases in which a heightened standard of foreseeability is met – cases where the defendant had "particular knowledge or special reason to know that a particular plaintiff or identifiable class of plaintiffs would suffer a particular type of injury." Id. at 342 (internal quotations and citation omitted).

12

Determining the scope of tort liability presents a question of law. <u>Kelly v. Gwinnell,</u> 96 N.J. 538, 552 (1984). "The question of whether a duty to exercise reasonable care to avoid the risk of harm to another exists is one of fairness and policy that implicates many factors." <u>Carvalho v. Toll Bros. & Developers</u>, 143 N.J. 565, 572 (1996). The inquiry "turns on whether the imposition of such a duty satisfies an abiding sense of basic fairness under all of the circumstances in light of considerations of public policy." <u>Hopkins v. Fox & Lazo Realtors,</u> 132 N.J. 426, 439 (1993).

"Foreseeability of the risk of harm is the foundational element in the determination of whether a duty exists." <u>J.S.,</u> 155 N.J. at 337. "Foreseeability is significant in the assessment of a duty of care to another; moreover, it has a dual role in the analysis of tort responsibility." <u>Olivo v. Owens-Ill., Inc.,</u> 186 N.J. 394, 402 (2006). In the duty of care analysis, foreseeability "is based on the defendant's knowledge of the risk of injury and is susceptible to objective analysis." <u>J.S.,</u> 155 N.J. at 338. That knowledge may arise from actual awareness, <u>Carvalho,</u> 143 N.J. at 576, or knowledge may be constructive when the defendant "was in a position to foresee and discover the risk of harm . . . ." <u>Id.</u> at 578.

"In some cases where the nature of the risk or the extent of harm is difficult to ascertain, foreseeability may require that the defendant" know a certain class of reasonably foreseeable persons would likely suffer injury. J.S., 155 N.J. at 338; see also C.W. v. Cooper Health Sys., 388 N.J. Super. 42, 62 (App. Div. 2006); Safer v. Estate of Pack, 291 N.J. Super. 619, 626-27 (App. Div. 1996). "Also included in the analysis is 'an assessment of the defendant's "responsibility for conditions creating the risk of harm" and an analysis of whether the defendant had sufficient control, opportunity, and ability to have avoided the risk of harm.'" Podias v. Mairs, 394 N.J. Super. 338, 350 (App. Div. 2007) (quoting J.S., 155 N.J. at 339).

In J.S., our Court held:

> In determining whether a duty is to be imposed, courts must engage in a rather complex analysis that weighs and balances several, related factors, including the nature of the underlying risk of harm, that is, its foreseeability and severity, the opportunity and ability to exercise care to prevent the harm, the comparative interests of, and the relationships between or among, the parties, and, ultimately, based on considerations of public policy and fairness, the societal interest in the proposed solution.
>
> [Id. at 337.]

Measured against J.S.'s standard of particularized foreseeability, the evidence in this case is adequate to warrant imposition of a duty on defendant.

14

We conclude that if plaintiff proves the standard of care required defendant to immediately alert T.E.'s psychiatrist about her command hallucinations, it was foreseeable that T.E. posed a danger to plaintiff and her supervisor, and it is fair to hold that defendant had a duty to take reasonable steps to avoid exposing them to danger posed by T.E.

Our conclusion derives from defendant's role as T.E.'s longtime therapist and the obligations imposed upon her by the standard of care, particularly in light of her extensive knowledge of T.E.'s background and history. We find highly significant that T.E.'s criminal history included two previous violent assaults and that her psychiatric history included multiple psychotic episodes, with defendant personally observing T.E. responding to outside stimuli on two occasions.

We also consider relevant defendant's role in creating the risk of harm to plaintiff, including the assessment of Dr. Dackis that defendant "needlessly identified [plaintiff] as the source of information" regarding the command hallucinations; in addition, defendant failed to advise plaintiff that she had not immediately alerted T.E.'s psychiatrist about the command hallucinations, and that when confronted about the hallucinations, T.E. became upset and denied the hallucinations.

A-2466-18T1

The record and defendant's own deposition testimony clearly indicates she was made aware of T.E.'s command auditory hallucinations, and T.E.'s history of psychosis, assaults with weapons, and need for monitoring in the event of her decompensation. The record indicates T.E. was hiding the fact she was hearing voices because she wanted to resume custody of her children. Moreover, defendant learned at T.E.'s intake interview of her willingness to provide false information, when she admitted lying about using PCP in order to secure her release from a psychiatric unit.

Dr. Dackis further emphasized that, "Even after meeting on [November 7, 2014, defendant] still failed to tell Dr. Singh that [T.E.] was concealing command auditory hallucinations." Moreover, Dr. Dackis highlighted that defendant was aware of T.E.'s criminal history of aggravated assault involving knives and that T.E. was psychotic during at least one of her knife attacks. In conclusion, Dr. Dackis stated T.E. was "floridly psychotic" in the fall of 2014 and defendant failed to heed the instruction to immediately report signs of decompensation to Dr. Singh.

In light of these specific circumstances demonstrating defendant had a particularized foreseeability that T.E. could act violently against plaintiff or her supervisor, we conclude it was a misapplication of the law to grant summary

16

judgment to defendant. Viewing all relevant evidence and reasonable inferences in the light most favorable to plaintiff, a jury could reasonably conclude that defendant should have known T.E. was experiencing a psychosis on October 28, 2014 and should have immediately reported T.E.'s symptoms of psychosis to her treating psychiatrist; instead, defendant proceeded to confront T.E., and in the process, endangered plaintiff and her supervisor. It remains plaintiff's burden to establish the remaining elements of her negligence claim – whether defendant breached her duty of care, and whether that breach was a proximate cause of plaintiff's injuries and damages.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2466-18T1