NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3177-22
     A-3178-22

ESTATE OF DONVILLE
CAMPBELL, through Executor
of the Estate, DWAYNE
CAMPBELL,

   Plaintiff-Respondent,

v.

WOODCLIFF HEALTH &
REHABILITATION CENTER,

   Defendant-Respondent,

and

BIRINDER KAUR, M.D.,

   Defendant-Appellant.
_____

ESTATE OF DONVILLE
CAMPBELL, through Executor
of the Estate, DWAYNE
CAMPBELL,

   Plaintiff-Respondent,

v.

WOODCLIFF HEALTH &
REHABILITATION CENTER,

> APPROVED FOR PUBLICATION
>
> **June 26, 2024**
>
> APPELLATE DIVISION

Defendant-Appellant,

and

BIRINDER KAUR, M.D.,

Defendant-Respondent.
_____

Argued January 18, 2024 – Decided June 26, 2024

Before Judges Accurso, Gummer and Walcott-Henderson.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-7744-21.

Ryan Alan Notarangelo argued the cause for appellant Birinder Kaur, M.D. in A-3177-22 and respondent in A-3178-22 (Dughi, Hewit & Domalewski, attorneys; Rachel Melissa Schwartz, of counsel; Ryan Alan Notarangelo, of counsel and on the briefs).

Salvatore Christopher Martino argued the cause for appellant Woodcliff Health & Rehabilitation Center in A-3178-22 and respondent in A-3177-22 (Lewis Brisbois Bisgaard & Smith, LLP, attorneys; Malinda Ann Miller, Alex W. Raybould, Salvatore Christopher Martino and Salvatore D'Elia III, of counsel and on the briefs).

Alexandra Loprete argued the cause for respondent Estate of Donville Campbell, through Executor of the Estate, Dwayne Campbell (Fredson Statmore Bitterman, LLC, attorneys; Alexandra Loprete, of counsel and on the briefs).

Anthony Cocca argued the cause for amicus curiae New Jersey Defense Association (Cocca & Cutinello,

LLP, attorneys; Anthony Cocca and Katelyn E. Cutinello, of counsel and on the briefs).

Daniel B. Devinney argued the cause for amicus curiae New Jersey Association for Justice (Snyder Sarno D'Aniello Maceri & da Costa LLC, attorneys; Paul Manuel da Costa, of counsel and on the brief; Daniel B. Devinney and Mitchell A. Dornfeld, on the brief).

The opinion of the court was delivered by

ACCURSO, P.J.A.D.

Selva Campbell, a stroke patient, was admitted to defendant Woodcliff Health & Rehabilitation Center in Bergen County on March 23, 2020, coming under the care of defendant Birinder Kaur, M.D. less than two weeks after the World Health Organization declared the novel coronavirus (COVID-19) a global pandemic and two days after Governor Murphy issued his first stay-at-home order.

Three weeks later, on April 14, Woodcliff discharged Mrs. Campbell from the facility to her home and the care of her husband Donville Campbell. The day before Mrs. Campbell's discharge, Dr. Kaur administered a COVID PCR (polymerase chain reaction) test to Mrs. Campbell. The off-site lab returned a positive test result to Woodcliff on April 16, two days after Mrs. Campbell's discharge. The facility notified Mrs. Campbell of her positive test

as soon as staff received it. According to plaintiff, Woodcliff advised "Mrs. Campbell should quarantine, and Mr. Campbell should be tested immediately."

Mrs. Campbell recovered from COVID, although she has since succumbed to other causes. Tragically, however, Mrs. Campbell's husband contracted COVID shortly after his wife, allegedly from her, and he died from complications of the virus on May 28, 2020.

Plaintiff, the Estate of Donville Campbell, filed a three-count complaint against Woodcliff and Dr. Kaur alleging medical negligence, wrongful death and a survival claim, all premised on Dr. Kaur's alleged "negligent, grossly negligent, careless and reckless actions and omissions" in failing to ensure Mrs. Campbell was not COVID positive before discharging her from Woodcliff. Plaintiff alleged Dr. Kaur owed a duty not only to her patient Mrs. Campbell, "but also to those third parties who foreseeably and reasonably relied on competent skill and care to be exercised" by Dr. Kaur in testing Mrs. Campbell for COVID and discharging her home, "and who would be foreseeably affected by any deviation in the standard of care," such as her husband Mr. Campbell.

Defendants Woodcliff and Dr. Kaur moved to dismiss the complaint for failure to state a claim pursuant to Rule 4:6-2(e), alleging they owed no duty of care to Mr. Campbell, and that defendants were immune under the New Jersey

COVID-19 Immunity Statute, L. 2020, c. 18, and the Public Readiness and

Emergency Preparedness Act (PREP Act), 42 U.S.C. § 247d-6d.[1]  The trial

court denied defendants' motions and their motions for reconsideration, finding

plaintiff should be permitted the opportunity to take discovery on whether

defendants' conduct constituted gross negligence, thereby depriving them of

the immunity provided by the New Jersey COVID-19 Immunity Statute.

---

[1]  A few more procedural notes.  Defendants initially removed the case to federal court under the PREP Act.  They consented to a remand to state court following the Third Circuit's decision in Estate of Maglioli v. All. HC Holdings LLC, rejecting removal of similar state law negligence claims under the Act.  16 F.4th 393 (3d Cir. 2021) (noting "that a defendant might ultimately prove that a plaintiff's claims are pre-empted . . . does not establish that they are removable to federal court") (alteration in original) (quoting Caterpillar Inc. v. Williams, 482 U.S. 386, 398 (1987)).  Defendants' motions to dismiss followed.

The parties disagree over whether defendants asserted immunity under the Emergency Health Powers Act, N.J.S.A. 26:13-1 to -36, in their motions to dismiss or on reconsideration and thus whether that argument was properly preserved for appeal.  We cannot come to any conclusions based on the documents included in the record on appeal.  Our disposition makes it unnecessary to resolve the issue.

Finally, we granted the motion of the New Jersey Defense Association to appear as amicus curiae, echoing defendants' arguments that they owed no duty of care to non-patient third parties on the facts alleged and that trial courts should be instructed to dismiss COVID-related complaints against healthcare providers with prejudice before discovery "unless specific factual allegations of criminal or intentional misconduct or gross negligence are presented and that claims of gross negligence are supported with facts."

A-3177-22

We denied defendants' motions for leave to appeal the denial of their dismissal motions. The Supreme Court granted defendants' motions for leave to appeal and remanded the matter to us for consideration on the merits. See Malik v. Ruttenberg, 398 N.J. Super. 489, 494 (App. Div. 2008) (noting "[a] motion to dismiss filed early in a proceeding is a particularly effective device to resolve any claim of immunity"). Having reviewed the record and heard argument, we consolidate defendants' appeals for purposes of this opinion and reverse the denial of their motions to dismiss, finding defendants immune from any liability under the New Jersey COVID-19 Immunity Statute.

We review a trial court's decision granting or denying a motion to dismiss pursuant to Rule 4:6-2(e), applying the same standard governing the trial court. ACLU of N.J. v. Cnty. Prosecutors Ass'n of N.J., __ N.J. __ (2024) (slip op. at 13). Although "our inquiry is limited to examining the legal sufficiency of the facts alleged on the face of the complaint," we give plaintiff "every reasonable inference" to be drawn from those facts, without any concern about its ability to prove the allegations at this early stage of the litigation. Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989). If, however, "the complaint states no basis for relief and discovery would not provide one, dismissal is the appropriate remedy." Banco Popular N. Am. v. Gandi, 184 N.J. 161, 166 (2005). As our review is de novo, we owe

6

no deference to any of the trial court's legal conclusions we deem mistaken. Dimitrakopoulos v. Borrus, Goldin, Foley, Vignuolo, Hyman and Stahl, P.C., 237 N.J. 91, 108 (2019).

Defendants contend they owed no duty to Mr. Campbell as a matter of law because he was not their patient and they rendered him no medical care. See Perna v. Pirozzi, 92 N.J. 446, 465 (1983) (explaining "[w]here damages are the proximate result of a deviation from standard medical care, a patient has a cause of action for malpractice"). They further contend that even assuming for purposes of argument they owed some duty to Mr. Campbell, they are immune from liability for damages from injury or death resulting from any of their acts or omissions in providing medical services in response to the COVID outbreak during the public health emergency under the COVID Immunity Statute[2] and are immune from suit and liability under the PREP Act.

---

[2] Defendants contend they also have immunity under Executive Order No. 112 (March 28, 2020), which provided immunity at the time of these events to healthcare professionals and facilities for damages alleged to have been sustained as a result of the individual's or facility's "acts or omissions undertaken in good faith in the course of providing healthcare services in support of the State's COVID-19 response," although not extending "to acts or omissions that constitute a crime, actual fraud, actual malice, gross negligence or willful misconduct." Because the immunity provided to defendants by the COVID Immunity Statute is at least as broad as that conferred by Executive Order 112, we do not address defendants' immunity under the Executive Order.

A-3177-22

Plaintiff counters that New Jersey has long "recognized that medical care providers owe a duty to take reasonable steps to protect readily identifiable third-party victims that may be put at risk by the providers' lack of adherence to the standard of care," see McIntosh v. Milano, 168 N.J. Super. 466, 485 (Law Div. 1979) (imposing duty on a psychiatrist to warn identifiable victim of a dangerous patient),[3] including the duty to warn potential victims of contagious diseases, id. at 484.

---

[3] McIntosh has been largely superseded by statute as the Legislature has since defined the duties of licensed mental health practitioners under the circumstances presented in that case. Specifically, following the Law Division's decision in McIntosh, the Legislature enacted N.J.S.A. 2A:62A-16(a), declaring any licensed mental health practitioner "immune from any civil liability for a patient's violent act against another person or against himself unless the practitioner has incurred a duty to warn and protect the potential victim as set forth in subsection b. of this section and fails to discharge that duty as set forth in subsection c. of this section." The Court has explained "[t]he statute's legislative history makes clear that the act was intended . . . to codify McIntosh and to clarify the ways in which a mental health practitioner can discharge the duty to warn and protect potential victims of violence" without incurring civil liability. Marshall v. Klebanov, 188 N.J. 23, 38 (2006) (citing S. Judiciary Comm., Statement to S. 3063 at 1 (March 11, 1991); Sponsor's Statement to S. 3063 at 2 (Nov. 19, 1990) ("Under current law, the therapist's legal responsibility to warn of a patient's potential for violence is unclear. . . . This bill serves as a specific guideline for practitioners caught in [a] quandary [between a duty to warn and the duty of confidentiality] and protects them from liability under appropriate circumstances.") (alterations in original)). As noted, the statute has largely — but not entirely — superseded the holding in McIntosh. See Coleman v. Martinez, 247 N.J. 319, 345-47 (2021) (declining to extend the common law to conform to N.J.S.A. 2A:62A-16(a) for licensed social workers, not included among the statute's list of licensed mental health practitioners).

Although the Estate acknowledges the COVID Immunity Statute extends to defendants, it contends it pleaded facts from which a reasonable jury could conclude defendants were grossly negligent or reckless, thus depriving them of the statute's protections. Plaintiff further contends its common law malpractice claims are not preempted by the PREP Act, as the injuries it suffered from defendants' discharge of Mrs. Campbell before learning the results of her COVID PCR test were not "caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure" under that statute. 42 U.S.C. § 247d-6d(a).

We reject defendants' argument that settled New Jersey law establishes they owed no duty to Mr. Campbell because he was not their patient and they provided him no medical care. Although it may well be that defendants owed no duty to Mr. Campbell, it is not possible to definitively say so on this complaint. See Printing Mart, 116 N.J. at 746 (requiring courts to search for a "fundament of a cause of action . . . even from an obscure statement of claim, opportunity being given to amend if necessary") (quoting Di Cristofaro v. Laurel Grove Mem'l Park, 43 N.J. Super. 244, 252 (App. Div. 1957)).

We are, however, confident that even if plaintiff could amend its complaint to articulate a recognizable duty in defendants, plaintiff could not plead facts sufficient to permit a reasonable jury to find defendants were

A-3177-22

grossly negligent or reckless in not waiting to discharge Mrs. Campbell from Woodcliff while the result of her PCR test was pending. See Scheidt v. DRS Techs., Inc., 424 N.J. Super. 188, 193 (App. Div. 2012) (noting "the essential facts supporting plaintiff's cause of action must be presented in order for the claim to survive; conclusory allegations are insufficient in that regard"). Simply stated, the Legislature's decision in the COVID Immunity Statute to temporarily limit the scope of whatever duty we might recognize defendants owed the Campbells to one of simply avoiding gross negligence during the height of the COVID pandemic leaves the Estate unable to state a claim on the facts alleged. It is not possible for a reasonable jury to find defendants were not simply negligent, but grossly negligent or reckless in discharging Mrs. Campbell from Woodcliff to the care of her husband in April 2020, before knowing the result of her pending PCR test.

"Whether a duty of care exists is a question of law that must be decided by the court." Jerkins v. Anderson, 191 N.J. 285, 294 (2007). Plaintiff has filed a malpractice action against defendants. As we explained almost forty years ago, malpractice is "a breach of the duty owed by one in rendering professional services to a person who has contracted for such services; in physician-malpractice cases, the duty owed by the physician arises from the physician-patient relationship." Ryans v. Lowell, 197 N.J. Super. 266, 273

10

(App. Div. 1984); see also Verdicchio v. Ricca, 179 N.J. 1, 23 (2004) (explaining "[a] medical malpractice case is a kind of tort action in which the traditional negligence elements are refined to reflect the professional setting of a physician-patient relationship").

Although there are New Jersey cases extending a physician's duty to a third-party not the physician's patient, there are not many. See, e.g., Fosgate v. Corona, 66 N.J. 268, 270-71, 274 (1974) (permitting recovery by members of patient's household who contracted tuberculosis as a result of physician's malpractice in failing to diagnose the disease in his patient over the course of six years; albeit without any discussion of duty); McIntosh, 168 N.J. Super. at 489 (holding a psychiatrist may have a duty to warn a potential victim that her patient presents "a probability of danger to that person"); Schroeder v. Perkel, 87 N.J. 53, 65 (1981) (holding physicians had duty to advise parents of child-bearing age that their first-born suffered from cystic fibrosis, a life-threatening genetic disease); Safer v. Est. of Pack, 291 N.J. Super. 619, 625 (App. Div. 1996) ("recognizing a physician's duty to warn those known to be at risk of avoidable harm from a genetically transmissible condition"); C.W. v. Cooper Health Sys., 388 N.J. Super. 42, 47-48 (App. Div. 2006) (holding a physician who violates the duty to reasonably inform the patient of the results of an HIV (human immunodeficiency virus) test pending on his discharge from the

11

hospital, may be "civilly liable to not only the patient, but to all reasonably foreseeable individuals who contract the virus" from the patient).

We recently declined to extend the duty a prescribing physician owes his patient to warn of adverse side effects of prescribed medications for the benefit of third parties. Vizzoni v. B.M.D., 459 N.J. Super. 554, 566 (App. Div. 2019). And our Supreme Court has even more recently observed that "[d]etermination of whether a duty of care should be found with respect to harm caused by a third party is a particularly 'uncertain . . . area of tort law.'" Coleman v. Martinez, 247 N.J. 319, 338 (2021) (quoting McKesson v. Doe, __ U.S. __, 141 S. Ct. 48, 51 (2020)).

In McIntosh, the trial court addressed, as a matter of first impression in New Jersey, whether the defendant psychiatrist "had a duty to warn Kimberly McIntosh, her parents or appropriate authorities" that his seventeen-year-old patient, Lee Morgenstein, who had been in a relationship of some sort with McIntosh and eventually murdered her, had "posed a physical threat or danger" to the twenty-two-year-old young woman. 168 N.J. Super. at 470-73, 476.

The McIntosh court acknowledged that whether a therapist has a duty "to warn or guard against" the risk of a crime or tort "by a patient to some third party, depends," in New Jersey, "on questions of fairness involving a weighing of the relationship of the parties, the nature of the risk involved, and

12

the public interest in imposing the duty under the circumstances," id. at 483, in accord with the analysis adopted by our Supreme Court in Goldberg v. Housing Authority of Newark, 38 N.J. 578, 583 (1962).  Nevertheless, the court looked to the Restatement (Second) of Torts §§ 315, 319 (Am. L. Inst. 1965)[4] for the generally accepted rule as to a person's duty to third parties and its exceptions, explaining:

> a person (the first person) does not have a duty to control the conduct of another person (the second person and the potential tortfeasor) so as to prevent that person from harming a third person unless a special relationship exists either between the first

---

[4]  Section 315 of the Second Restatement, "General Principle," provides:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

Section 319 of the Second Restatement, "Duty of Those in Charge of Person Having Dangerous Propensities" provides:

> One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

person and the second person imposing such a duty or between the first person and the third person giving him a right to protection.

[168 N.J. Super. at 483.]

The trial court also looked for guidance to the California Supreme Court's landmark decision in Tarasoff v. Regents of University of California, 551 P. 2d 334, 345 (Sup. Ct. 1976), which had applied section 315 of the Restatement to hold the relationship between a therapist and his patient was sufficient to impose an affirmative duty on the therapist for the benefit of third persons, and to the Restatement's formulation of the general duty to take reasonable precautions for the safety of others, including the obligation to exercise control over the conduct of third persons with dangerous propensities, Restatement (Second) of Torts § 319. Relying on those authorities, the trial court in McIntosh found a psychiatrist "may have a duty to take whatever steps are reasonably necessary to protect an intended or potential victim of his patient" when "the patient is or may present a probability of danger to that person." 168 N.J. Super. at 489.

The court explained

[t]he relationship giving rise to that duty may be found either in that existing between the therapist and the patient, as was alluded to in Tarasoff . . . or in the more broadly based obligation a practitioner may have to protect the welfare of the community, which is

14

> analogous to the obligation a physician has to warn
> third persons of infectious or contagious disease.

> [Id. at 489-90.]

The court thus concluded that the obligation it imposed was "similar to that already borne by the medical profession in another context."  Id. at 490.

McIntosh is a trial court decision that was never appealed.  Although that court found the doctor-patient relationship imposed on the physician "a duty to warn third persons against possible exposure to contagious or infectious diseases, e.g., tuberculosis, venereal diseases, and so forth," id. at 484, there is no New Jersey case cited for that proposition.  The court noted only that "New Jersey recognizes the general rule that a person who negligently exposes another to a contagious disease, which the other contracts, is liable in damages."  Ibid. (citing Earle v. Kuklo, 26 N.J. Super. 471, 475 (App. Div. 1953)).

The plaintiffs in Earle alleged their infant daughter had contracted tuberculosis from their landlord, who lived below them in a two-family house. 26 N.J. at 473-74.  The Earles alleged the defendant landlord knew or should have known she was infected with the disease when she rented them the apartment and breached her duty to advise them of her condition "and to abstain from close personal contact with [the] plaintiffs at all times."  Id. at 474.

15

We reversed a judgment for the landlord on the pleadings, holding that "[o]ne who rents premises to another, knowing that the premises are infected with contagious disease germs which render them dangerous, without disclosing that fact to the tenant, is liable in damages for injury resulting from the contracting of the disease by the tenant or a member of his family." Id. at 475. We found no reason for the trial court to have found the complaint failed to state a claim, short of assuming that it "concluded that tuberculosis was not a dangerous and communicable disease — a conclusion contrary to all known medical authorities." Id. at 476.

Earle, of course, involved a direct claim of negligence. The case did not address the question of third-party liability and does not support the McIntosh court's statement that a New Jersey "physician has the duty to warn third persons against possible exposure to contagious or infectious diseases, e.g., tuberculosis, venereal diseases, and so forth." Id. at 484. Indeed, the only New Jersey case of which we are aware that arguably even touched that question before McIntosh is Fosgate.

Fosgate, a malpractice action by a misdiagnosed tuberculosis patient and members of her family to whom she'd spread the disease, reached the Court, however, on the plaintiffs' appeal of the denial of their motion for a new trial on damages. 66 N.J. at 270-71. The Court's discussion is devoted to the

16                                                                                      A-3177-22

problem of approximating and apportioning damages in a medical negligence case where the malpractice aggravates a pre-existing condition or disease and the Court's reasons for determining to shift the burden of apportioning the damages in such cases to the defendant doctor, foreshadowing the Court's holding in Scafidi v. Seiler, 119 N.J. 93 (1993).

Although the Court deemed the damages awarded to the patient's family members, like those awarded to the patient, inadequate, there is no analysis of the basis for the doctor's liability to the patient's family members. The Court states only that "[t]he jury found that they were exposed to and contracted tuberculosis infection as a result of defendant's malpractice," suggesting the duty was a derivative one. Fosgate, 66 N.J. at 274.

More recently, we considered, and rejected, a physician's duty to warn a third-party of the patient's positive HIV test in C.W, reasoning that the harm to C.W.'s intimate partner "flow[ed] from C.W.'s ignorance of his own health status," not from the hospital's failure to notify the partner of the patient's medical condition. 388 N.J. Super. at 61. The healthcare providers' duty to the intimate partner of an HIV patient we imposed in C.W. was a derivative one arising out of the providers' deviation from the standard of care owed to C.W., not from a "duty to warn third persons against possible exposure to contagious or infectious diseases," McIntosh, 168 N.J. Super. at 484. C.W.,

17

388 N.J. Super. at 61 (holding the healthcare provider's duty vis-à-vis the third-party is "to take all reasonable measures to notify the patient of the results of his HIV test, and thereafter counsel the infected patient on how to avoid the transmission of the virus. Once this is done, it is up to that individual to act responsibly in his own conduct."). See also Olivo v. Owens-Illinois, Inc., 186 N.J. 394, 404-05 (2006) (imposing derivative duty on landowner "for injury to plaintiff's spouse caused by exposure to the asbestos he brought home on his work clothing").

Our point is not to say that McIntosh was wrongly decided or that a physician owes no duty of care to one not her patient. It's that on inspection there does not appear to be any well-established common law rule in New Jersey that a "physician has the duty to warn third persons against possible exposure to contagious or infectious diseases" as stated in McIntosh. 168 N.J. Super. at 489. Moreover, no New Jersey published case before or since McIntosh has looked to the Restatement to establish the existence and scope of a physician's duty to a third party,[5] and the Court recently disavowed the

---

[5] Safer, in which we recognized "a physician's duty to warn those known to be at risk of avoidable harm from a genetically transmissible condition," is not to the contrary. 291 N.J. Super. at 625. Although we cited the Restatement as a tertiary-level source there, we relied on McIntosh in concluding "[i]n terms of foreseeability especially, there is no essential difference between the type of genetic threat at issue here and the menace of infection, contagion or a threat

18

Restatement formulation as the source of such duty in <u>Coleman v. Martinez</u>, 247 N.J. 319, 354 n.9 (2021) (holding a licensed social worker had a common law duty to a third-party arising out of a failure to refer client for psychiatric evaluation under the particularized foreseeability analysis in <u>J.S. v. R.T.H.</u>, 155 N.J. 330, 342-43 (1998)).  Although acknowledging that "New Jersey typically gives considerable weight to Restatement views, and has, on occasion, adopted those views as the law of this State when they speak to an issue our courts have not yet considered," <u>Citibank, N.A. v. Est. of Simpson</u>, 290 N.J. Super. 519, 530 (App. Div. 1996), the Court in <u>Coleman</u> expressly rejected the "special relationship" standard of section 41[6] of the <u>Restatement</u>

_____

of physical harm." <u>Ibid.</u>  We also disavowed any general duty to warn arising out of a physician/patient relationship, acknowledging "an overly broad and general application of the physician's duty to warn might lead to confusion, conflict or unfairness in many types of circumstances." <u>Id.</u> at 626.

[6] Section 41 provides:

> Duty to Third Parties Based on Special Relationship
> with Person Posing Risks
>
> (a) An actor in a special relationship with another
>     owes a duty of reasonable care to third parties with
>     regard to risks posed by the other that arise within
>     the scope of the relationship.
>
> (b) Special relationships giving rise to the duty
>     provided in Subsection (a) include:

(Third) of Torts: Liability for Physical and Emotional Harm (Am. L. Inst.
2012) (which replaced sections 315-319 of the Second Restatement),
concluding "the particularized foreseeability test established in our
jurisprudence readily covers whether a mental-health practitioner could be
found to owe a duty of care for harm caused by a patient under a particular set
of factual circumstances."[7]  Coleman, 247 N.J. at 354 n.9.

_____

          (1) a parent with dependent children,

          (2) a custodian with those in its custody,

          (3) an employer with employees when the
              employment facilitates the employee's causing
              harm to third parties, and

          (4) a mental-health professional with patients.

[7] Interestingly, although the Third Restatement in section 41 "imposes a duty
on mental-health professionals ('therapists') to warn foreseeable victims of a
risk posed by one of their patients," it "'takes no position,' . . . as to whether a
non-mental-health physician owes a similar duty to warn foreseeable third
parties of a risk, for example, of communicating disease, posed by one of the
physician's patients."  Cardi, W. Jonathan, A Pluralistic Analysis of The
Therapist/Physician Duty to Warn Third Parties, 44 Wake Forest L. Rev. 877,
877 (2009).  As explained in comment h to section 41:

> The physician-patient relationship is not among the
> relationships listed in this Section as creating an
> affirmative duty.  That does not mean that physicians
> have no affirmative duty to third parties.  Some of the
> obligations of physicians to third parties, such as with
> patients who are HIV-infected, have been addressed
> by legislatures.  In other areas, the case law is

20

It is thus inaccurate to assert, as plaintiff does, that defendants had a "broad based duty to protect the welfare of the community" arising "from the special relationship between the provider and the patient" or, as defendants do, that there is no duty owed to any person not their patient. The test in New Jersey is not a categorical one, but fact specific, based on a complex inquiry that involves identifying, weighing, and balancing "several, related factors, including the nature of the underlying risk of harm, that is, its foreseeability and severity," the opportunity and ability to prevent the harm, "the comparative interests of, and the relationships between or among, the parties, and, ultimately, based on considerations of public policy and fairness, the societal interest in the proposed solution." J.S., 155 N.J. at 337.

In our view, the duty analysis in this case is complicated, and plaintiff's claims are not well-defined. The complaint arguably sets out two theories of liability. The Estate alleges defendants breached their duty of care to Mr. and Mrs. Campbell by failing "to ensure Selva Campbell was not COVID-19

_____
sufficiently mixed, the factual circumstances sufficiently varied, and the policies sufficiently balanced, that this Restatement leaves to further development the question of when physicians have a duty to use reasonable care or some more limited duty — such as to warn only the patient — to protect third parties.

[Restatement (Third) of Torts § 41cmt. h.]

positive before discharge," thereby failing "to ensure COVID-19, a communicable disease, was not spread outside of [Woodcliff] to individuals Selva Campbell would foreseeably come into contact with and who would foreseeably contract COVID-19 from her, such as her husband, plaintiff's decedent Donville Campbell."  The Estate also alleges defendants "had a duty to take adequate and reasonable measures to notify the patient, Selva Campbell, of her positive COVID-19 test results before her discharge, and counsel her, as an infected patient, on how to avoid transmission of the virus."  Stated differently, plaintiff alleges defendants breached the standard of care by discharging Mrs. Campbell while the result of her PCR test was pending or discharging her with a positive COVID-19 test and by failing to instruct her, as an infected patient on discharge, how to avoid transmitting the virus to Mr. Campbell or others.

"In a medical-malpractice action, the plaintiff has the burden of proving the relevant standard of care governing the defendant-doctor, a deviation from that standard, an injury proximately caused by the deviation, and damages suffered from the defendant-doctor's negligence."  Komlodi v. Picciano, 217 N.J. 387, 409 (2014).  A physician is ordinarily required to exercise reasonable care in the diagnosis and treatment of her patients, Marshall v. Klebanov, 188 N.J. 23, 39 (2006), meaning she "must act with that degree of care, knowledge,

22

and skill ordinarily possessed and exercised in similar situations by the average member of the profession practicing in the field," id. at 33, and further that "[a] physician's duty . . . may extend beyond the interests of a patient to members of the immediate family of the patient who may be adversely affected by a breach of that duty."  Schroeder, 87 N.J. at 65.

But the duty — in the context of a third-party claim against a healthcare provider for injuries from an infectious or communicable disease acquired from the provider's patient — remains in this State a derivative one.[8]  See C.W., 388 N.J. Super. at 59.  And it is unclear exactly how plaintiff claims defendants breached their duty of care to Mrs. Campbell.

Plaintiff doesn't claim Dr. Kaur failed to diagnose or misdiagnosed Mrs. Campbell's infection, or that a delay in diagnosis or discharge to her home adversely affected her recovery.  Plaintiff also does not allege defendants breached their duty under C.W. to take reasonable measures to notify Mrs. Campbell of the positive result of her PCR test following her discharge, which

_____

[8]  The Court has made clear, however, that the claim by the plaintiffs in Schroeder that they would have avoided conceiving a second child had the defendant doctor timely diagnosed their first child with cystic fibrosis, is, like other "wrongful birth" claims, not a derivative claim but an independent cause of action arising out of the deprivation of the parents' right "either to accept or reject a parental relationship," 87 N.J. at 66; that is "their right to recover is not 'because of injury' to their child, but because of direct injury to their own independent rights," Procanik v. Cillo, 97 N.J. 339, 356 (1984).

23

plaintiff admits defendants did as soon as they received it — advising Mrs. Campbell to quarantine and Mr. Campbell to be immediately tested for the virus. See C.W. 388 N.J. Super. at 47-48. Plaintiff is asking that we extend the duty we recognized in C.W. to advise a patient of the positive result of a test for an infectious disease following discharge from the hospital with instructions on how to avoid exposing others, to a duty not to discharge a potentially infectious patient, a duty with far-ranging — and unexplored — implications.

The essence of plaintiff's claims — that defendants shouldn't have discharged Mrs. Campbell on April 14, 2020, while the result of her PCR test was still pending because it potentially exposed Mr. Campbell to the virus — is problematic. Leaving aside the ramifications of detaining a patient in a medical facility solely because she is a potential carrier of an infectious or communicable disease, delaying Mrs. Campbell's discharge from Woodcliff for the sole purpose of obtaining the result of a PCR test would have unnecessarily lengthened her exposure to the virus in a congregant setting were she not already infected, putting her interest and that of her husband at odds.[9] To the extent plaintiff claims Mrs. Campbell was ignorant of her health

---

[9] On March 31, 2020, a week after Mrs. Campbell was admitted to Woodcliff, the Commissioner of Health issued a Directive entitled "Hospital Discharges

24

status on discharge, and that defendants had a duty to notify her of her status and how she, as an infected patient, could avoid transmission of the virus, it's unclear whether plaintiff is alleging Mrs. Campbell was unaware Dr. Kaur had administered a COVID test to her or that she was unaware the result would be positive; it's also not clear why instructions on how to avoid transmitting the disease would depend on Mrs. Campbell's positive status.

Although the foreseeability of harm to Mr. Campbell if Mrs. Campbell were infected with the virus on her discharge home, with or without notice of her positive status, is readily evident, other elements of the particularized foreseeability test — the obligations inuring in the relationship between

_____

and Admissions to Post-Acute Care Settings" advising of the "urgent need to expand hospital capacity to be able to meet the demand for patients with COVID-19 requiring acute care" and expressly prohibiting post-acute care facilities, like Woodcliff, from denying admission or re-admission to patients who had tested positive for COVID and from requiring hospitalized patients who were determined to be "medically stable" to be tested for COVID prior to admission/re-admission.

By the time of Mrs. Campbell's discharge from Woodcliff on April 14, the Commissioner was aware of the surging number of COVID infections in long-term care facilities and was attempting to take steps to address the problem. At the Governor's April 20, 2020 Coronavirus Briefing, in the week following Mrs. Campbell's discharge, the Commissioner reported that of the 88,806 cases in the state, "27.9% are associated with long-term care facility clusters or outbreaks" and that "overall, in our mortalities, 40% are associated with long-term care facilities." See Gov. Phil Murphy, Transcript: Coronavirus Briefing Media (Apr. 20, 2020), https://www.nj.gov/governor/news/news/562020/20200420c.shtml [https://perma.cc/N2W6-FEDR].

defendants and their patient, Mrs. Campbell, as well as the relationship between defendants and Mr. Campbell and that between Mr. and Mrs. Campbell; the attendant risks to Mrs. Campbell and her husband, which as we've noted appears to be not only different but in conflict; and their and defendants' ability to exercise care, which is not at all obvious on the pleadings — do not plainly mark a path toward "a decision that both resolves the current case and allows the public to anticipate when liability will attach to certain conduct." Coleman, 247 N.J. at 338 (quoting G.A.-H. v. K.G.G., 238 N.J. 401, 414 (2019)).

Obviously, part of the problem in defining the duty here by looking to the precedent of C.W. is that COVID is spread by airborne transmission, although that was not understood at the time of the events giving rise to this case.[10] That fact highlights that these events took place in the earliest days of

---

[10] The World Health Organization in March 2020 concluded initial evidence suggested transmission of the virus occurred through direct contact with an infected individual through droplet transmission and fomites in that person's immediate environment. Modes of transmission of virus causing COVID-19: implications for IPC precaution recommendations, World Health Organization (Mar. 29, 2020), https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations [https://perma.cc/65VV-BZ7Q]. The WHO did not officially declare airborne transmission of the virus until December 2021. Coronavirus disease (COVID-19): How is it transmitted?, World Health Organization (Dec. 23, 2021), https://www.who.int/news-room/questions-and-

the pandemic, when little was known about the virus — other than it was very contagious and had a high mortality rate particularly among the ill and the elderly — and in the face of rapidly changing edicts and advice from government agencies attempting to address the public health crisis and slow the spread of the disease.

Plaintiff's failure to define defendants' duty here without resort to a purported obligation on the part of a physician to warn third persons against possible exposure to contagious or infectious diseases — for which we find no root in our common law — and the problems and uncertainties we've identified in its derivative claims would ordinarily lead us to remand the case with directions to dismiss the complaint without prejudice to allow plaintiff the opportunity to replead to address the deficiencies in its theory of liability. See Hoffman v. Hampshire Labs, Inc., 405 N.J. Super. 105, 116 (App. Div. 2009). We are convinced, however, by the Legislature's adoption of the COVID Immunity Statute, L. 2020, c. 18 § 1(c), signed into law on April 14, 2020, the day of Mrs. Campbell's discharge, and effective immediately, retroactive to March 9, that amendment to better articulate a theory of liability would be futile on these facts. See Banco Popular, 184 N.J. at 166.

_____
answers/item/coronavirus-disease-covid-19-how-is-it-transmitted
[https://perma.cc/8DM9-DPUB].

The statute provides that neither a health care facility nor health care professional shall

> be liable for civil damages for injury or death alleged to have been sustained as a result of an act or omission by the health care professional in the course of providing medical services in support of the State's response to the outbreak of coronavirus disease during the public health emergency and state of emergency declared by the Governor in Executive Order 103 of 2020.

The legislation specifically provides that the immunity granted "shall not apply to acts or omissions constituting a crime, actual fraud, actual malice, gross negligence, recklessness, or willful misconduct." The statute expired on September 1, 2021, with the declared end of the public health emergency, although the civil immunity for healthcare professionals continued, limited to those individuals specifically engaged in testing for and providing vaccinations against COVID-19. See L. 2021, c. 103.

Plaintiff does not dispute the Immunity Statute extends to defendants. And we have no hesitation in holding the Statute plainly altered the scope of any common law duty defendants owed to Mrs. Campbell, and derivatively to plaintiff's decedent Mr. Campbell. See Lafage v. Jani, 166 N.J. 412, 460 (2001) (LaVecchia, J., dissenting) (noting "[t]he Legislature is free to expand, modify, or abrogate common law as it may reasonably determine"). The Immunity Statute is a clear enunciation of the State's public policy to

28

temporarily limit the scope of defendants' duty to one of simply avoiding gross negligence, or worse, in their provision of medical services in connection with the State's response to the COVID-19 outbreak in New Jersey during the declared public health emergency.  In considering both public policy and fairness in determining the duty defendants owe here, we can think of no clearer an articulation of "the societal interest in the proposed solution" than the solution actually imposed by the Legislature.[11]  J.S., 155 N.J. at 337.

If plaintiff's failure to clearly define the duty of defendants is not fatal to its claims, the Legislature's temporary alteration of the scope of that duty surely is.  Facts sufficient to establish defendants' alleged gross negligence have become an element of plaintiff's prima facie case for medical malpractice here in the same way, for example, that proof of palpable unreasonableness is a part of a plaintiff's prima facie proof in a dangerous condition of public property case, cf. Vincitore v. N.J. Sports & Expo. Auth., 169 N.J. 119, 125

---

[11]  Because the Legislature's temporary alteration of the common law worked by the Immunity Statute targets these defendants, we are not faced with the issue that split the Court in Coleman.  See 247 N.J. at 358 (Albin, J., dissenting) (arguing "the common law should be harmonized with the standards of N.J.S.A. 2A:62A-16" defining the duties of mental health professionals to third parties, so as to treat licensed social workers, who are not covered by the statute, the same as licensed clinical social workers, who are "so that the public policies enunciated by the Legislature through its statutory enactment and by this Court through the common law are not in conflict").

(2001) (explaining that in order to impose liability on a public entity under N.J.S.A. 59:4-2, a plaintiff must establish "the entity's conduct was 'palpably unreasonable'"); Margolis and Novack, Claims Against Public Entities, cmt. on N.J.S.A. 59:4-2, at 156 (2024) (noting "[p]roof that the entity was unreasonable is part of plaintiff's prima facie cause of action"), or proof of reckless disregard is an element of a plaintiff's defamation action against a media defendant publishing on a matter of public interest, Durando v. Nutley Sun, 209 N.J. 235, 248-54 (2012) (explaining the formidable requirement of establishing a defendant acted with actual malice or reckless disregard makes such cases ripe for summary judgment), or facts establishing willful and wanton conduct are necessary for a minor child to state a claim for inadequate supervision against his parent, Foldi v. Jeffries, 93 N.J. 533, 549 (1983) (abrogating parent-child tort immunity for parental conduct that is willful or wanton).

Assuming plaintiff could draft a complaint to better articulate a theory of liability giving rise to a recognizable duty in defendants, no reasonable jury could find the acts and omissions plaintiff claims constitute the breach of defendants' duty, viewed most favorably to it, rise to the level of gross negligence. See Canesi v. Wilson, 158 N.J. 490, 511 (1999) (explaining that when applying "the standard governing the duty," the task is to "consider

whether the evidence . . ., viewed most favorably for plaintiffs, was sufficient to enable a jury to determine that defendants violated the duty owed plaintiffs").

As our Supreme Court has explained, "gross negligence falls on a continuum between ordinary negligence and recklessness, a continuum that extends onward to intentional conduct." Steinberg v. Sahara Sam's Oasis, LLC, 226 N.J. 344, 363 (2016). The term relates to acts or omissions commonly described as egregious, Kain v. Gloucester City, 436 N.J. Super. 466, 482 (App. Div. 2014), and "undoubtedly denotes 'the upper reaches of negligent conduct,'" Steinberg, 226 N.J. at 364 (quoting Parks v. Pep Boys, 282 N.J. Super. 1, 17 n.6 (App. Div. 1995)). The Court has endorsed the definition in our model jury charge, see Model Jury Charge (Civil) § 5.12 "Gross Negligence" (2019), which "conveys that gross negligence is an indifference to another by failing to exercise even scant care or by thoughtless disregard of the consequences that may follow from an act or omission." Steinberg, 226 N.J. at 364-65.

Although plaintiff has not clearly identified any recognizable duty defendants owed Mrs. Campbell and her husband in its complaint, what is clear is that plaintiff did not plead facts that would permit a reasonable jury to conclude defendants were indifferent to Mrs. Campbell or acted egregiously in

31

"thoughtless disregard of the consequences" to her or her husband by discharging her from Woodcliff while the result of her PCR test was pending and by immediately advising them of the positive result when defendants received it two days later.  C.W., 388 N.J. Super. at 59-62; see also Nostrame v. Santiago, 420 N.J. Super. 427, 436 (App. Div. 2011) (explaining as "New Jersey is a 'fact' rather than a 'notice' pleading jurisdiction, . . . a plaintiff must allege facts to support his or her claim"; conclusory allegations are insufficient).

Despite plaintiff's possession of Mrs. Campbell's medical records, nowhere in the complaint did plaintiff allege defendants knew or should have known Mrs. Campbell had COVID-19 prior to receiving her test result, see Kuklo, 26 N.J. Super. at 475, or that they erroneously advised her she needn't worry about the test or the possibility of infecting her husband or others, see Schroeder, 87 N.J. at 59-61.  Plaintiff asserted only that defendants failed to notify Mrs. Campbell, "of her positive COVID-19 test results before her discharge, and counsel her, as an infected patient, on how to avoid transmission of the virus."

Although plaintiff might be able to articulate a clearer theory of liability, that given what was known about the transmissibility of the virus, for example, defendants shouldn't have discharged Mrs. Campbell without advising her to

32

assume she had been infected and to conduct herself accordingly until the result of her PCR test confirmed otherwise, we could not find the failure to provide her that information for two days would satisfy plaintiff's obligation to plead facts sufficient to support the element of gross negligence. Cf. Black v. Borough of Atl. Highlands, 263 N.J. Super. 445, 452 (App. Div. 1993) (noting a finding of palpable unreasonableness "like any other fact question before a jury, is subject to the court's assessment whether it can reasonably be made under the evidence presented").

Plaintiff is simply without facts to demonstrate that defendants' alleged breach of the standard of care owed to Mrs. Campbell, however reasonably defined, amounted to more than simple negligence; certainly there is nothing in the facts alleged to demonstrate an extreme or reckless deviation in defendants' discharge of Mrs. Campbell. Cf. N.J. Div. of Youth & Fam. Servs. v. J.L., 410 N.J. Super. 159, 166-69 (App. Div. 2009) (considering whether mother was merely inattentive or negligent, or grossly negligent in allowing her two young children to walk to their condominium door from a playground within her line of sight).

Satisfied plaintiff has failed to state a claim on which relief could be granted, we reverse the order denying defendants' motion to dismiss the complaint. Sickles v. Cabot Corp., 379 N.J. Super. 100, 106 (App. Div. 2005)

(noting "a court must dismiss the plaintiff's complaint if it has failed to articulate a legal basis entitling plaintiff to relief").  Although, as already noted, orders granting Rule 4:6-2 motions are ordinarily entered without prejudice, Printing Mart, 116 N.J. at 772, because we are convinced based on the limited scope of duty governing defendants' conduct under the COVID Immunity Statute that discovery will not supply a claim here, the complaint should be dismissed with prejudice.  See Dimitrakopoulos, 237 N.J. at 107; see also AC Ocean Walk, LLC v. Am. Guar. & Liab. Ins. Co., 256 N.J. 294, 319 (2024).  Our disposition makes it unnecessary to address defendants' alternative claim that the trial court erred in failing to dismiss the complaint pursuant to the PREP Act.[12]

Reversed and remanded for entry of an order dismissing the complaint with prejudice.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[12]  Although the language of the PREP Act providing that "covered persons" such as defendants "shall be immune from suit and liability under Federal and State law with respect to all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure," 42 U.S.C. § 247d-6d, such as a COVID test, suggests the Act could apply here, federal authority, at least at the pleading stage, appears to the contrary.  See, e.g., Hampton v. State of California, 83 F.4th 754, 764 (9th Cir. 2023) (holding "for PREP Act immunity to apply, the underlying use or administration of a covered countermeasure must have played some role in bringing about or contributing to the plaintiff's injury.  It is not enough that some countermeasure's use could be described as relating to the events underpinning the claim in some broad sense").